**Patricia Marshall SCOTT, Plaintiff,**

v.

**OCE INDUSTRIES, INC., Defendant.**

**No. 80 C 2113.**

United States District Court,
N. D. Illinois, E. D.

March 2, 1982.

Paddy Harris McNamara, Chicago, Ill., for plaintiff.

John B. Lashbrook, Pope, Ballard, Shepard & Fowle, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This action has been tried upon the facts without a jury. After considering all the evidence and the briefs and arguments of counsel, in accordance with Fed.R.Civ.P. 52(a) the Court finds the facts and states its conclusions of law as follows:

*Findings of Fact ("Findings")*

### I. Introduction

#### A. Nature of the Case and Prior Proceedings

1. Patricia Marshall Scott ("Scott") filed this action April 30, 1980 charging that Océ Industries, Inc. ("Océ") had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, and the Equal Pay Act, 29 U.S.C. § 206(d). Before trial Scott withdrew her Equal Pay Act claims and proceeded solely on her Title VII charges. Scott alleged that Océ had discriminated against her on the basis of sex, in

that her compensation and terms and conditions of employment were determined by unlawful considerations and she was subjected to harassment that forced her resignation.

2. Scott's Complaint was timely, having been filed within 90 days of her receipt of a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). Scott's initial and amended charges before the EEOC were also timely filed:

(a) Her initial charge was filed March 18, 1977, within 180 days of the events complained of.

(b) Her amended charge, filed in September 1978, was based on her claimed constructive discharge. It therefore alleged additional unlawful employment practices related to or growing out of the original charge.

3. Trial commenced October 23, 1981 and concluded October 29, 1981 with final arguments taking place November 2, 1981.

B. *Parties*

4. At the time of her Océ employment Scott was a widowed white female using the name Patricia Marshall (she has since married and changed her last name to Scott). Scott began working at Océ in January 1974 as the credit secretary. From December 1, 1974 through the termination of her employment April 25, 1977 she was employed as Assistant Credit Manager of the Repro division ("ACM-Repro").

5. Océ, headquartered in Chicago, Illinois, is an employer within the meaning of Title VII. During the entire time period relevant to this action Océ had two divisions, the Repro and ICP divisions.

II. *Scott's Employment Record*

6. Scott's predecessor as ACM-Repro was a man named Ronald Norton ("Norton"). Norton had been hired in October 1973 at a starting salary of $12,000, subject to a review and an increase if his performance were found satisfactory four to six months after hiring. Instead Norton was fired in May 1974. From the pattern of Océ's increases (both on merit and to meet inflation) reflected in the record, it is reasonable to conclude that had Norton performed satisfactorily as ACM-Repro he would have been earning *not less than* 10% more (or $13,200) by December 1, 1974 (more than a year after hiring).

7. Scott was qualified to perform the duties of ACM-Repro effective December 1, 1974. Indeed she had handled the assignment on a trial basis since July 1, 1974 and had voluntarily asked to wait to assume the ACM title until she was adequately trained. Scott's initial salary as an ACM was $9,460 (all salaries in these Findings are stated on an annual basis). That was increased July 14, 1975 to $10,465. At that time Océ's personnel action form for Scott (P. Ex. 3) stated, "Since Patricia is doing all of the credit work for the Repro Division, the above requested increase still brings in the cost of this position at substantially less than her predecessor, Ron Norton." Océ's personnel action forms for Scott dated January 19, 1976 (P. Ex. 4) and January 19, 1977 (P. Ex. 5) reflect that her performance was "excellent" and "outstanding."

8. Norton had substantially more experience in handling credit than did Scott. However the job of ACM, although it requires intelligence and application, is not an extraordinarily complex or highly skilled activity for which substantial experience is either necessary or relevant. Indeed the fact is that Scott performed the ACM job in an "excellent" and "outstanding" way while Norton had not. Scott has established that in comparison with Norton she performed equal work for unequal compensation. Océ's offered reasons for the difference, in the light of this and subsequent Findings, are pretextual. This Finding is not vitiated by the fact that Scott, as a conscientious employee wanting to continue to increase her skills, continued to seek and obtain further on-the-job training from her superior (Credit Manager Paul Calhoun) on dealing with credit problems.

9. In February 1976 the relevant credit department personnel and their respective salaries were as follows:

Terry Harrigan
Credit Manager
$20,000

| Repro | ICP |
|---|---|
| Patricia Marshall (Scott)<br>Assistant Credit Manager<br>$11,544 | Donald McNeil<br>Assistant Credit Manager<br>$16,500 |
| Pamela DiMaria<br>Credit Correspondent<br>$7,800 | Amy Wolf<br>Assistant Credit Manager<br>$8,060 |

As of January 19, 1976 Scott had received a 10.3% increase. As for the ACMs in the ICP division, there were substantial differences between them in age and experience. However the fact that in large part their job content and responsibilities were equivalent leads to the inference that the gross disparity in compensation levels was attributable in part to the difference in sex between the two ACMs in ICP. Amy Wolf ("Wolf") like Scott had also been promoted from a secretarial position to ACM. Both the Scott and Wolf situations reflect a viewpoint on the part of Océ's relevant supervisory personnel that a male ACM was an ACM, while a female ACM was little more than a glorified secretary.

10. Terry Harrigan ("Harrigan") was Credit Manager from August 12, 1975 through September 24, 1976 (his predecessor Paul Calhoun had held the position from sometime in 1974). In the spring of 1976 Harrigan informed Océ Treasurer Ronald Larson ("Larson") he was thinking of leaving Océ. Larson delegated to Harrigan the task of finding his own replacement. Océ placed no advertisements for Harrigan's successor.

11. Harrigan hired Edward Regal ("Regal"), who began working for Océ August 6, 1976 at a salary of $18,000. Harrigan and Regal were former co-workers at Admiral Corporation's credit department and were friends. Regal's initial title was ACM, replacing Donald McNeil ("McNeil"), who was then earning $16,536. On September 24, 1976 Regal became Credit Manager and his salary was increased to $19,000.

12. Regal hired John Gonzales ("Gonzales"), another former co-worker from Admiral, in late August 1976. Gonzales began working as an ACM–ICP September 13, 1976 at a $15,500 salary.

13. There was some difference in the skills required for the ACM jobs for the Repro division (held by Scott) and the ICP division (held by Gonzales and Wolf). However that difference was not of such a material nature (even taking into account Gonzales' greater experience) as to call for the differential that existed between the Gonzales and Scott salaries.[1]

14. Until about January 21, 1977 Scott and Regal had a satisfactory working relationship.[2] Regal authorized appropriate business travel for Scott, and about January 1977 he properly corrected an unjust criticism of Scott's work by Océ's Dallas branch manager (the complained-of incident had been caused by the Dallas office, not Scott).

15. About January 21, 1977 Scott had a conference with Regal as to her annual

---

1. Larson's testimony as to the difficulty of the ACM–ICP job as contrasted with the claimed ease of Scott's ACM-Repro job was exaggerated and not credible. Larson admitted that trade acceptances, the most difficult aspect of the ICP work, were also handled by Wolf, one of the lowest paid people in the credit department. McNeil as well as Scott also testified that the ACM–ICP work was divided on a geographical basis, with Wolf and McNeil performing the same functions. Moreover Larson's testimony contrasting the cost of equipment sold by the two divisions and the type of customers served by each was similarly exaggerated. As to the former, Larson himself admitted that the Repro 3600 model was very popular and sold for the comparatively low cost of $1,500 in 1977. As for the latter, Scott's customer compilation, as well as Larson's disclo-

sure on cross-examination that he had no basis for his statement, belied Larson's testimony that the "vast majority" of the Repro customers were Fortune 500 companies. Océ's failure to produce either comparisons of amounts collected by the ICP and Repro divisions or a breakdown of the ICP and Repro customer lists, information readily available to it, further lessens the credibility of its witnesses' claims that the ACM–ICP job was materially more difficult than Scott's work.

2. This was so although Regal on occasion used sexist terminology in the office, such as referring to women slightingly as "broads." There is no evidence that he directly called Scott or any other woman working in the office a "broad."

review. During the conference Scott raised the wide disparity between her salary and that of Gonzales. Regal consulted Larson as to Scott's complaint about her salary.

16. After conferring with Larson, Regal told Scott that an 8% increase was the best Océ could do, because it was seeking to adhere to an 8% guideline for increases. However both Regal and Gonzales received raises in excess of 8% during 1977. On April 25, 1977 Gonzales received a raise to $17,000 (a 9.7% increase), a salary higher than his predecessor McNeil had received. On July 1, 1977 Regal received a raise to $22,000 (an 11.1% increase), a salary higher than his predecessor Harrigan had received.

17. There is a sharp dispute in the testimony as to whether Regal told Scott her salary was more than most executive secretaries and later asked her to replace Inez Dolatowski, who resigned as the credit secretary in February 1977. Scott's EEOC charge related both incidents. This Court has observed the demeanor of both witnesses and has taken into account the additional fact that Pamela DiMaria testified to a conversation in which Regal told her, during a salary review, that she was at a dead end at Océ and didn't need to worry about her salary because she was just going to get married and have children. This Court credits Scott's testimony that the disputed conversations took place.

18. After the Scott-Regal conferences as to Scott's salary increase, Regal's and Océ's treatment of Scott underwent a sharp change. As a witness Regal evinced both defensiveness and a kind of insecurity that, coupled with his narrow view of employed women already referred to, is consistent with his altered treatment of Scott. Among other matters:

(a) Regal began to inform Scott of various changes in her duties only by memos, placed on her desk while she was out of the office. Both the nature and effect of this and other conduct by Regal may best be judged by the fact that Regal and Scott (and others) were in the same small office, with their desks no more than 20 feet apart.

(b) Regal avoided speaking to Scott except to respond to direct inquiries she brought to him.

(c) Regal told Scott she would no longer be able to travel as part of her duties. Regal told her he felt it was unsafe for a woman to travel by herself (though that was not Océ's reason for the change, which was a general cutback—not elimination—of travel to economize).

(d) On February 8, 1977 Regal informed Scott by memo that she could no longer approve lease orders. Regal did not believe Scott had previously mishandled any such orders.

(e) On March 8, 1977 Regal directed Scott by memo to turn over any orders being held in credit longer than seven days. Thereafter Scott no longer had any involvement with such orders, and Regal did not discuss them with her.

It is unnecessary to decide whether some of the changes had possible business justification, as Océ contends. Both the initiation of a number of such changes in a short time span, significantly reducing Scott's responsibilities, and the extraordinary means of communicating such changes and all other business matters reflected employer activity justifying the filing, and confirming the validity, of Scott's EEOC charges.

19. On March 18, 1977 Scott filed EEOC charges. On March 22 Scott informed Carolyn Morgan (Océ's one-person personnel "department") she had done so.[3] Morgan immediately told Larson, and Morgan and Larson jointly informed Regal that same afternoon. Larson instructed Morgan to consult with Océ's attorneys that day.

20. Regal read Scott's EEOC charge at some point while she was still employed at Océ. Regal testified that his understanding, both at that time and at trial, was that the basis of Scott's complaint was that Regal made changes in the credit depart-

---

3. Pamela DiMaria had gone to Morgan complaining about problems with Regal. Morgan then asked Scott to see Morgan and inquired whether Scott had the same kind of problems. Scott said she had and advised Morgan she had just filed an EEOC complaint.

ment without Scott's approval. That reading of the charge is untenable and further undermines Regal's credibility as a witness.

21. After Regal was informed of Scott's EEOC filing, he made no effort to change his method of communicating with her or with Pamela DiMaria. When asked at trial about any changes he made to improve the relationship, he responded that he did nothing and then asked, "What was I supposed to do?" In fact his pattern of making Scott's job less meaningful, and her working conditions less tolerable, continued. Moreover his testimony that Scott resisted change was rebutted by his own acknowledgement on cross-examination that she fully complied with any changes he initiated in the credit department.

22. Sometime in March 1977 Regal began to open the mail each morning and to send checks directly to the bank. Regal did not discuss any need for, or the adoption of, that new procedure with either Scott or Pamela DiMaria. That change added to the adverse conditions of Scott's job by reducing the volume of mail she received to a very low level, further diminishing her functions.

23. After Scott filed her EEOC charge other Océ personnel joined Regal in "building a record" to denigrate Scott's performance as ACM-Repro and also joined Regal in further isolating her as an employee. Thus for example:

(a) Herbert Russell (Océ's Vice President of sales-marketing) wrote an April 15, 1977 memorandum to Larson (P. Ex. 35) whose sole purpose was to build a record to make Scott appear both incompetent and uncooperative.[4] In fact no evidence was introduced that she failed in either respect.

(b) Robert Fortune (Océ's national sales manager for marketing) told McNeil ("between you and I" [sic]) that it would be in McNeil's own best interest not to be seen associating with Scott in the Océ offices because she had filed an EEOC charge.

24. Regal told Scott in March or early April 1977 that he had been "told I can't fire you, but I can certainly make it tough so you quit." Scott considered resigning but decided instead to take her vacation in April 1977, hoping that a cooling-off period would bring about a change on Regal's and Océ's part and enable her to keep working at Océ. When she returned in the latter part of April she found that the files and "open item book" that represented her principal remaining job responsibility were no longer at her desk. At that point her working conditions had become wholly intolerable, amounting to a constructive discharge. On April 25, 1977 Scott told Larson she had decided to leave Océ, signing a letter of resignation Larson dictated for her signature.

25. All the cumulative acts discussed in earlier Findings, involving inequity in Scott's salary based on her sex, reduction of her responsibilities, increasing isolation, attempts to set up situations in which Scott would either fail to perform or look as though she was failing to perform, and finally the removal of Scott's files and "open item book" while she was on vacation, amounted to a constructive discharge of Scott. Accordingly her "resignation" referred to in Finding 24 was effectively forced on her.

26. On the basis of the conflicting testimony in this case, this Court concludes that Scott and her witnesses have presented the more credible account of the circumstances surrounding Scott's employment with Océ and that the reasons articulated by Océ for the salary disparity are unworthy of belief and were in fact a pretext for discrimination.

---

**4.** On cross-examination Russell testified that in 1979 the credit department (Regal was still its manager) had caused material problems for Russell's sales group, discussed at a sales managers' meeting for Océ's regional offices. That fact according to Russell did not lessen his high opinion of Regal's abilities, and it did not occasion his writing a memo to Océ executives accusing Regal of "sandbagging" the sales department, as Russell had done to discredit Scott.

27. Scott did not immediately seek other employment, believing that Océ would take her back (she discussed that matter with the EEOC). She did check newspaper want ads and communicated with prospective employers by telephone. She registered with the Illinois Bureau of Employment and about July 1977 registered with a single employment agency specializing in management rather than clerical jobs, advising them she was looking for work in the credit field in which she was skilled. No such jobs were available, nor was she able to find such jobs through the newspaper want ads or by communicating with other employment agencies.

28. Scott performed some work for a company called NuTheme, owned by the son of her then fiance (now her stepson), at the end of August 1977. She worked on collection of delinquent accounts and reordered the firm's accounting functions generally. At the beginning of September 1977 Scott became ill for a few months and was unavailable for work. Scott's limited involvement in NuTheme has led to her becoming a principal in that company, increasing to the point in June 1978 when she took over most of the management functions. It was agreed at that time that she would operate the business for four years, then would become its owner for a nominal amount (that arrangement has since been formalized by a written agreement).

29. Scott is not entitled to damages in any case for the period after she opted to become an entrepreneur with NuTheme, for her decision to seek a buildup of equity in that company (the amount and value of which is in part intangible and has not been proved by her) amounts to a failure to meet

her burden of proving damages thereafter. It is reasonable for Scott to recover damages from Océ for a period of four months after her termination, until she became ill and was unable to work in any case.

30. There was no evidence as to the amount or duration of any unemployment compensation benefits received by Scott. In any event, such benefits will not be applied to reduce Scott's recoverable damages here.

31. Scott's actual Océ compensation and other earnings, and the compensation Oce would have paid to a male occupying the same position as ACM-Repro, are as follows:

| Period Involved | Scott | Male ACM–Repro |
|---|---|---|
| 12/1/74 – 7/13/75 | $5,045.33 [5] | $7,040 [6] |
| 7/14/75 – 1/18/76 | 5,377.85 [7] | 6,783.33 [6] |
| 1/19/76 – 1/18/77 | 11,544 | 14,559.60 [8] |
| 1/19/77 – 4/25/77 | 3,328 | 4,259.17 [9] |
| 4/26/77 – 8/25/77 | 837.50 [10] | 5,323.96 [9] |
| Totals | $26,132.68 | $37,966.06 |

*Conclusions of Law*

1. This Court has jurisdiction of the parties and the subject matter of this action under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17.

2. Scott timely filed an EEOC charge of sex discrimination (the "Charge") against Océ March 18, 1977. Océ's last act of sex discrimination in connection with Scott's level of compensation had occurred at the time of her last salary review and raise effective January 19, 1977, and Scott had thereafter received other sex-related adverse treatment from her immediate superior Regal.

3. Scott's amended EEOC charge filed October 13, 1978, alleging a constructive discharge, is also within the Court's jurisdiction. Its gravamen is that the dis-

---

**5.** This is calculated at a $9,460 annual rate.

**6.** This is calculated at a $13,200 annual rate.

**7.** This is calculated at a $10,465 annual rate.

**8.** This represents the same 10.3% increase in annual rate given Scott in January 1976, which the Court finds a male ACM would also have reasonably received.

**9.** This is calculated at a $15,971.88 annual rate, representing the same 9.7% increase given to Gonzales as ACM–ICP April 25, 1977 (despite

Océ's claim to Scott that an 8% increase was "the best it could do"). That annual rate is less than Gonzales' actual salary of $17,000, thereby giving reasonable effect to Océ's exaggerated claim that the ACM–ICP job was more difficult than the ACM-Repro job.

**10.** This is the amount Scott received from NuTheme. It does not include any unemployment compensation as stated in Finding 30 and Conclusion 11.

criminatory practices complained of in the Charge continued after its filing, effectively forcing and making reasonable Scott's resignation. That claim of constructive discharge is properly included within the Complaint in this Court as being "like or reasonably related to" the allegations in the Charge. *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164 (7th Cir. 1976). Alternatively, this Court has jurisdiction over the constructive discharge claim because it alleges unlawful employment practices related to and growing out of the subject matter of the Charge. *Sanchez v. Standard Brands*, 431 F.2d 455 (5th Cir. 1970). Additionally, because the constructive discharge occurred during the pendency of the Charge before the EEOC, a second authorization to sue is not required. *Kirkland v. Buffalo Board of Education*, 622 F.2d 1066 (2d Cir. 1980).

4. Scott has alleged unlawfully disparate treatment. Accordingly, Scott must prove that Océ intentionally discriminated against her. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Océ need not prove the absence of discriminatory motive on its part. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Furnco Construction Co. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

5. Scott has met her burden of establishing a prima facie case of discrimination on the basis of sex by proving that (a) she is a member of a class of persons protected under Title VII, (b) she performed her duties as ACM-Repro satisfactorily, (c) she performed substantially equal work for unequal compensation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 803, 93 S.Ct. 1817, 1824, 1825, 36 L.Ed.2d 668 (1971). Scott has proved that her work was "outstanding" (Océ's characterization) but that her salary was lower than a male ACM-Repro would have received due to sex discrimination. *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

6. Such a prima facie case shifted the burden to Océ to rebut the presumption of discrimination by producing evidence that Scott received a lower salary for legitimate, non-discriminatory reasons. Océ's meeting of that burden requires Scott to prove that the proffered reason was not the true reason. *Texas Dept. v. Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

7. As reflected in the Findings (including in particular summary Finding 26), Scott has met all the burdens of proof imposed on her by law as stated in these Conclusions.

8. Scott has proved that she was constructively discharged by Océ April 25, 1977. Océ had made Scott's working conditions so difficult and unpleasant that a reasonable person in her position would have felt compelled to resign. *Welch v. University of Texas and Its Marine Science Institute*, 659 F.2d 531, 533 (5th Cir. 1981); *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980); *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977).

9. Scott is entitled to an award of back pay for the period that commenced two years before the filing of the Charge (March 18, 1975) and ended April 25, 1977. *Stewart v. General Motors Corp.*, 542 F.2d 445, 453 (7th Cir. 1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105. Scott is also entitled to her salary, taking into account what she would have earned absent any discrimination, from April 25, 1977 until she was no longer available for other employment (which the Court finds to have occurred approximately August 25, 1977), reduced by the sum of her interim earnings.

10. This Court need not decide the general question whether an ex-employee's decision to engage in self-employment is a reasonable means of mitigating one's damages. *See* such cases, in another area of the law, as *Heinrich Motors v. NLRB*, 403 F.2d 145, 148 (2d Cir. 1968); *NLRB v. Cashman Auto Co.*, 223 F.2d 832 (1st Cir. 1955). Where such a decision (as in this case) results in the employee receiving both compensation and an equity interest in the

business (here Scott will become the owner of NuTheme upon paying a nominal amount), the appropriate amount to be deducted from the sum the ex-employer is obligated to pay is "the reasonable value of her services ... for which she did not receive any specific salary." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 449 (4th Cir. 1981). Under the facts here that reasonable value must by definition be identical to the reasonable value of her services that Scott is entitled to receive as damages. Accordingly no damages are recoverable for the period after she committed herself to NuTheme rather than the general employment market.

11. Scott's backpay award need not be reduced in any manner on account of unemployment compensation benefits she received during the period she was unemployed after being discharged by Océ. *EEOC v. Sandia Corp.*, 639 F.2d 600, 624–26 (10th Cir. 1980); *Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 736 (5th Cir. 1977).

\* \* \*

It is hereby ordered that Patricia Marshall Scott is awarded judgment against Océ Industries, Inc. in the sum of $11,833.38 plus costs (including reasonable attorneys' fees).