James **BAILEY**, Plaintiff,

v.

**John E. BINYON and Binyon's Incorporated, Defendants.**

No. 83 C 3312.

United States District Court, N.D. Illinois, E.D.

March 30, 1984.

Robert M. Hodge, Chicago, Ill., for plaintiff.

Charles V. Kralovec and Nancy Jo Arnold, Kralovec, Marquard, Doyle & Gibbons, Chartered, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

James Bailey ("Plaintiff") brought this action, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1870, 42 U.S.C. § 1981 ("§ 1981"), against John E. Binyon ("Binyon") and Binyon's Incorporated (collectively "Defendants"), seeking various forms of relief for Defendants' alleged racial discrimination against Plaintiff.[1] Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343, and is not contested. Presently before the court is Defendants' motion, under Fed.R.Civ.P. Rule 12(b)(6), to dismiss Plaintiff's first amended complaint ("complaint") for failure to state a claim upon which relief can be granted. For the reasons set forth below, Defendants' motion is denied.

### Factual Background

For purposes of Defendants' motion, we must, of course, accept as true the well-pleaded factual allegations of Plaintiff's complaint. *E.g., Reichenberger v. Pritchard,* 660 F.2d 280, 282 (7th Cir.1981). Further, we must view the reasonable inferences to be drawn from those allegations in the light most favorable to Plaintiff. *E.g., Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981). The complaint discloses that Plaintiff, who is black, was employed as a cook by Binyon's Incorporated, which owns and operates a restaurant in Chicago. Binyon is an officer of Binyon's Incorporated.

When Plaintiff arrived for work in the early morning of November 16, 1982, Bi-

---

1. Although Plaintiff mentions a "permanent injunction" (First Amended Complaint, ¶ 9), he does not demand injunctive relief. Plaintiff essentially asks for an award of back pay and employment benefits, compensatory and punitive damages, and attorney's fees. Although Plaintiff also states that he is seeking "declarations" that Defendants violated Title VII and § 1981, the granting of the other requested relief would necessarily incorporate such findings.

nyon and four other people (apparently other employees) were in the restaurant. As Plaintiff entered the main room of the restaurant, Binyon approached him and told him that he was dissatisfied with the soups and sauces which had been made the preceding day. When Plaintiff responded that he was not responsible for preparing the soups and sauces, Binyon stated that "all you niggers are alike." Plaintiff then walked into the kitchen, and Binyon followed him and called Plaintiff a "nigger."

Plaintiff told Binyon that he objected to the racial epithets and that he wanted to be treated "like a human being," to which Binyon replied, "You're not a human being, you're a nigger." At that point, Plaintiff put down his keys to the restaurant and prepared to leave. Binyon suggested to Plaintiff that, if Plaintiff did not like the manner in which he was being treated, he could file a complaint with the Illinois Department of Human Rights. As Plaintiff left the restaurant, Binyon said to him, "You'd stay if you weren't a sissy. If you were a man, you'd stay." As a result of Binyon's harassment of him, Plaintiff did not return to work at the restaurant. Plaintiff immediately reported the incident to the Illinois Department of Human Rights, and, after exhausting his administrative remedies, Plaintiff filed suit in this court.

### Discussion

Title VII provides, in part, as follows:
It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).[2] Section 1981 states that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Clearly, § 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). For present purposes, Defendants' liability, if any, under Title VII is coextensive with their liability under § 1981. *See Flowers v. Crouch-Walker Corporation*, 552 F.2d 1277 (7th Cir.1977); *Johnson v. Olin Corporation*, 484 F.Supp. 577 (S.D.Tex.1980). *See also T & S Service Associates, Inc. v. Crenson*, 666 F.2d 722, 724 (1st Cir.1981).[3] Accordingly, the discussion of Plaintiff's Title VII claim which follows is equally applicable to his § 1981 claim.

---

**2.** A private right of action under Title VII is created by 42 U.S.C. § 2000e–5.

**3.** We note that Binyon, as an officer of Binyon's Incorporated, may be liable to Plaintiff under § 1981. *See Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir.), *cert. denied*, 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975); *Manuel v. International Harvester Co.*, 502 F.Supp. 45, 49–50 (N.D.Ill.1980); *Garcia v. Rush-Presbyterian-St. Luke's Medical Center*, 80 F.R.D. 254, 266–267 (N.D.Ill.1978). Under Title VII, for purposes of Binyon's Incorporated's liability under 42 U.S.C. § 2000e–2(a)(1), Binyon's actions in this case clearly may be attributed to the corporate employer. *See* 42 U.S.C. § 2000e(b). Since Defendants have not raised the issue, we do not decide the question of whether Binyon may be individually liable to Plaintiff under Title VII. All of the courts of which we are aware which have actually decided that question have concluded that liability under Title VII extends to agents of an "employer." *See, e.g., Goodman v. Board of Trustees of Community College District 524*, 498 F.Supp. 1329, 1332 (N.D.Ill.1980). *But cf. Huebschen v. Department of Health and Social Services*, 716 F.2d 1167, 1170 (7th Cir.1983) (noting parties' agreement that a supervisory employee could not be individually liable under Title VII). We assume, for purposes of the present motion, that Binyon may be individually liable to Plaintiff under Title VII.

The rule is well established, of course, "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted). With that principle in mind, we consider the legal sufficiency of Plaintiff's complaint.

## I. *Basic Requirements*

A claim of racial discrimination in employment may be based either on a theory of "disparate treatment" or on a theory of "disparate impact." *See, e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In a disparate treatment case, such as the present one, unlike a disparate impact case, the plaintiff must prove discriminatory intent or motive on the part of the defendants.[4] *See, e.g., Bryant v. International Schools Services, Inc.*, 675 F.2d 562, 576 (3d Cir.1982). In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973), the Supreme Court explicitly delineated the burdens and order of presentation of proof in a disparate treatment case. The Court later summarized the *McDonnell Douglas* standards as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [411 U.S.] at 802 [93 S.Ct. at 1824]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true

reasons, but were a pretext for discrimination. *Id.*, at 804, 93 S.Ct. at 1825. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Although *McDonnell Douglas* involved an employer's hiring decision, the principles established in *McDonnell Douglas* are equally applicable to discharge cases. *See Flowers v. Crouch-Walker Corporation*, 552 F.2d at 1281 & n. 3.

The Court in *McDonnell Douglas* also set out a procedure through which a plaintiff can make a prima facie showing of racial discrimination in hiring using circumstantial evidence. 411 U.S. at 802, 93 S.Ct. at 1824. That procedure has been adapted to discharge cases, in which a plaintiff may satisfy his initial burden by establishing: "(1) that the plaintiff was a member of a racial minority; (2) that he was qualified for the job he was performing; (3) that he was satisfying the normal requirements in his work; (4) that he was discharged; and (5) that after his discharge the employer assigned white employees to perform the same work." *Flowers v. Crouch-Walker Corporation*, 552 F.2d at 1282. In the present case, Plaintiff contends that he was constructively discharged by Defendants. Defendants do not dispute the proposition that a constructive discharge is as much a "discharge" for purposes of Title VII as is an actual discharge. *See, e.g., Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 371–372 (5th Cir.1981).

We begin by considering Defendants' argument that Plaintiff has failed to state a claim because he has not alleged that he was qualified for his job, that he was satisfying the normal requirements of his job, or that he was replaced by a white person. At the outset, we note that the first two propositions, while not explicitly alleged, are clearly implied by Plaintiff's complaint; we thus would not dismiss that complaint on those grounds. The complaint does not even suggest, however, that Plaintiff's job

---

4. A plaintiff also must show intentional discrimination in order to establish a violation of § 1981. *General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375, 382–391, 102 S.Ct. 3141, 3146–3150, 73 L.Ed.2d 835 (1982).

was filled by a white person after Plaintiff left. Nonetheless, because we disagree with the premise of Defendants' argument, we find that that lacuna does not render the complaint legally insufficient.

Defendants err in "seiz[ing] upon the *McDonnell Douglas* pattern as the *only* means of establishing a prima facie case of individual discrimination." *International Brotherhood of Teamsters v. United States*, 431 U.S. at 358, 97 S.Ct. at 1866. In rejecting that argument in the *Teamsters* case, the Supreme Court stated that:

> Our decision in [*McDonnell Douglas*] ... did not purport to create an inflexible formulation. We expressly noted that "[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations." [411 U.S.] at 802 n. 13 [93 S.Ct. at 1824 n. 13]. The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under [Title VII].

431 U.S. at 358, 97 S.Ct. at 1866 (footnote omitted). *See also Donnell v. General Motors Corporation*, 576 F.2d 1292, 1296 (8th Cir.1978), *cert. denied*, 459 U.S. 844, 103 S.Ct. 97, 74 L.Ed.2d 88 (1982); Fed.Reg. Empl.Serv., Job Discrimination § 2:37, at 38 (rev. ed. 1983); 2 A. Larson and L. Larson, *Employment Discrimination* § 50.60, at 10–43 (1983). "[C]ourts must not allow the mechanical formula to blind them to the real issue of whether the defendant illegally discriminated against the plaintiff." *Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir.1980). Although cases in which direct evidence of intentional dis-

crimination exists are now rare, where an employer openly discriminates against an employee on the basis of the latter's race, a court has no reason to require the employee to make use of the *McDonnell Douglas* formula. *See Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir.1982); *Ramirez v. Sloss*, 615 F.2d at 168–169. *Cf. Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602, 608 (9th Cir.1982) (en banc), *cert. dismissed*, —— U.S. ——, 103 S.Ct. 1534, 75 L.Ed.2d 954 (1983) ("In some cases, facially different treatment itself implies intent."). We believe that, at this stage of the lawsuit, this is such a case.

We simply cannot accept Defendants' contention that the complaint does not show that Defendants treated Plaintiff any differently than their white employees because Plaintiff is black. (Whether that "disparate treatment" rises to the level of employment discrimination, within the meaning of Title VII and § 1981, is the more difficult question discussed below.) Defendants argue that Plaintiff has failed to show disparate treatment because he does not allege that only Defendants' black employees were subjected to racial or ethnic slurs. In other words, Defendants claim that they cannot be liable to Plaintiff if they also used derogatory ethnic epithets in addressing, for example, Irish, Italian, and Jewish employees. We strongly disagree. The use of the word "nigger" automatically separates the person addressed from every non-black person; this is discrimination *per se*.[5] As the Supreme Court of Minnesota has stated:

> We cannot regard use of the term "nigger" ... as anything but discrimination ... based on ... race.... When a racial epithet is used to refer to a [black] person ..., an adverse distinction is implied between that person and other persons not of his race. The use of the term "nigger" has no place in the civil treatment of a citizen....

---

5. Again, we emphasize the fact that our finding that Plaintiff has sufficiently alleged that Defendants have discriminated against him in this

sense does not necessarily imply that that discrimination is actionable under Title VII or § 1981.

*City of Minneapolis v. Richardson,* 307 Minn. 80, 239 N.W.2d 197, 203 (1976) (finding racial discrimination under state Human Rights Act). Our conclusion on this point is reinforced by the fact that *Binyon* explicitly distinguished between "human beings" and "niggers."

Because Plaintiff has alleged blatant, open racial discrimination on the part of Defendants, the complaint need not allege each of the elements of the *McDonnell Douglas* formula (as adapted to discharge cases in *Flowers*) in order to withstand a motion to dismiss. The absurdity of requiring that a black plaintiff in this situation show that, for example, he or she was replaced by a white person is easily demonstrated. Suppose that an employer said to a black employee, "I am discharging you because you are black, and only for that reason," but that the employer then hired another black person to replace the discharged black employee. If Defendants' position were correct, the employer would be immune from liability under Title VII. We refuse to accept the proposition that the employer cannot, as a matter of law, be found to have racially discriminated against the first black employee simply because the employer subsequently hired another black person. That notion defies both the purpose and the language of Title VII, and would allow a discriminatory employer easily to evade liability. As the Supreme Court stated in *International Brotherhood of Teamsters v. United States,* 431 U.S. at 341–342, 97 S.Ct. at 1858. "[t]he company's later changes in its hiring ... policies could be of little comfort to the victims of the earlier ... discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it." *Cf. DeLesstine v. Fort Wayne State Hospital and Training Center,* 682 F.2d 130, 132–133 (7th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 378, 74 L.Ed.2d 511 (1982) ("[Appellants'] reasoning would foreclose a plaintiff from proving a prima facie case unless an employer discriminated not only against plaintiff but also against every so-called protected minority by hiring a so-

called 'non-protected' person to fill the position.").

■ In sum, we find that, since Plaintiff has sufficiently alleged that Defendants treated him differently than their white employees because of his race, the only further showing required is that that disparate treatment can support a finding of constructive discharge. In other words, Plaintiff's complaint is not legally insufficient unless, as a matter of law, we must find that Defendants' alleged actions could not amount to a constructive discharge of Plaintiff. We now consider that problem.

## II. *Constructive Discharge*

■ In what has become the leading case on the subject of constructive discharge under Title VII, *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61 (5th Cir.1980), the court ruled that, in order to find a constructive discharge, " 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Id.* at 65, quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977). The Courts of Appeals for the Eighth and Tenth Circuits have added the requirement, specifically rejected in *Bourque,* that the employer's intent to force the employee to resign be shown. *See Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981); *Muller v. United States Steel Corporation,* 509 F.2d 923, 929 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). The Courts of Appeals for the Sixth, Ninth, Eleventh, and District of Columbia Circuits, however, have adopted the objective standard set forth in *Bourque. See Lojek v. Thomas,* 716 F.2d 675, 681 & n. 13 (9th Cir.1983); *Nolan v. Cleland,* 686 F.2d 806, 812–814 & nn. 16–17 (9th Cir.1982); *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir. 1982); *Henson v. City of Dundee,* 682 F.2d 897, 907 (11th Cir.1982); *Clark v. Marsh,* 665 F.2d 1168, 1173–1176 & n. 8 (D.C.Cir. 1981). In addition, district courts in the Second and Third Circuits have followed

*Bourque*, rather than *Johnson* and *Muller*. *See Orshan v. Macchiarola*, 570 F.Supp. 620, 625 (E.D.N.Y.1983); *E.E.O.C. v. Hay Associates*, 545 F.Supp. 1064, 1085–1087 (E.D.Pa.1982).

The Court of Appeals for the Seventh Circuit has not discussed the subject of constructive discharge in the context of an employment discrimination case. The court has, however, "identified two elements that must be satisfied to establish a constructive discharge [which rises to the level of a violation of the National Labor Relations Act]: first, the employer's challenged conduct must be so intolerable that the employee is forced to quit; second, the conduct must be undertaken with the intention of encouraging or discouraging membership in a labor union." *Jack Thompson Oldsmobile, Inc. v. N.L.R.B.*, 684 F.2d 458, 463 (7th Cir.1982) (citation omitted). Clearly, the second prong of this test is a necessary basis for a finding of an unfair labor practice under the National Labor Relations Act, but we find nothing in *Jack Thompson Oldsmobile* which suggests that the Seventh Circuit would adopt the quite different employer intent requirement of *Johnson* and *Muller* in an employment discrimination case. Indeed, we agree with Judge Shadur's implicit conclusion in *Scott v. Oce Industries, Inc.*, 536 F.Supp. 141 (N.D.Ill.1982), that the Seventh Circuit would instead follow *Bourque. Id.* at 148 (applying the *Bourque* standard). *Cf. Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir.1983) (referring the reader to *Bourque* for a discussion of constructive discharge). In short, we believe that the Seventh Circuit would follow the weight of authority and would not impose the unduly onerous burden of showing that the employer acted with the intention of forcing the employee to quit. The question on which cases such as this turn, then, is simply that of whether the "employer has made working conditions so difficult that a reasonable person [in the employee's position] would feel forced to resign." *Meyer v. Brown & Root Construction Co.*, 661 F.2d at 372.

Since what a reasonable person would or would not do under certain circumstances is, of course, a question of fact, the issue of whether a constructive discharge has occurred should generally be left to the trier of fact. *See, e.g., Nolan v. Cleland*, 686 F.2d at 812–814 (holding that summary judgment was improper on the issue of constructive discharge). Nevertheless, as in other areas of the law, the circumstances may be such that a person's actions can be found to be unreasonable as a matter of law. In particular, *Bourque* and its progeny have established that, as a matter of law, an employee who resigns solely on the basis of his or her employer's isolated violation of an employment discrimination statute generally acts unreasonably. An employee must seek legal redress while remaining in his or her job unless confronted with an "aggravated situation" beyond "ordinary" discrimination. *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d at 65–66. *See Nolan v. Cleland*, 686 F.2d at 813; *Clark v. Marsh*, 665 F.2d at 1173–1174; *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir.1981).

Thus, for example, the fact that a female employee receives unequal pay for equal work because of her sex has been held not to constitute an "aggravated situation" rendering her resignation effectively involuntary. *E.g., Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d at 66. Further, a discriminatory failure to promote, coupled with an unfavorable job reassignment, might not be sufficient. *See Muller v. United States Steel Corporation*, 509 F.2d at 929. On the other hand, a pattern of discriminatory treatment over time has been held to create an aggravated situation. *E.g., Nolan v. Cleland*, 686 F.2d at 813–814; *Clark v. Marsh*, 665 F.2d at 1174–1176. Sufficient aggravating factors were also found where a female employee received unequal pay because of her sex, her work responsibilities were reduced when she complained about her salary, she was harassed by a supervisor and other employees, and her files and other materials were removed from her desk while she

was on vacation. *Scott v. Oce Industries, Inc.*, 536 F.Supp. at 146.

Further, a finding of an aggravated situation may be based on an essentially isolated incident. *See Meyer v. Brown & Root Construction Co.*, 661 F.2d at 371–372. In *Meyer*, the plaintiff's supervisor informed her, several months after she had told him that she was pregnant, that she was being transferred to a job which involved performing heavy manual labor. Since the new job involved substantial risks of harm to the plaintiff and her unborn child, the plaintiff complained to her supervisor about the assignment. When, in response, her supervisor "snickered" and otherwise made clear that he was not concerned about her problem, the plaintiff resigned. Based on these facts, the court of appeals upheld the district court's decision that the plaintiff had been constructively discharged in violation of Title VII. *Id.*

Three Title VII cases have specifically considered the question of whether the use of racial epithets can support a finding of constructive discharge. In *Vaughn v. Pool Offshore Co.*, 683 F.2d 922 (5th Cir.1982), the plaintiff, a black man who worked on an offshore oil rig, was frequently referred to by his fellow employees and his supervisor as "nigger," "coon," and "black boy." The court noted, however, that the plaintiff joined in using similar ethnic epithets to refer to other employees, and that such remarks "were bandied back and forth without apparent hostility or racial animus." 683 F.2d at 924. The court pointed out that, on the two occasions when employees' racial remarks could not be characterized as "harmless," the plaintiff's supervisor had interceded on the plaintiff's behalf and had made clear that he strongly disapproved of such treatment. 683 F.2d at 924. Because of these facts, and because all but one of the incidents involved occurred several months before the plaintiff resigned, the court was "not persuaded that a reasonable employee would have found working conditions ... so racially difficult or unpleasant as to compel one to quit his job." 683 F.2d at 926.

In *Johnson v. Bunny Bread Co.*, 646 F.2d at 1256–1257, the plaintiffs, who were black, claimed that their working conditions had been made intolerable by the fact that they were often referred to as "niggers." Finding, however, that "[t]he use, if any, of racial terms was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward [the plaintiffs]," the court held that, as a matter of law, the plaintiffs had not been constructively discharged. 646 F.2d at 1256–1257. *See also Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982) ("casual and intermittent racial slurs do not always give rise to a constructive discharge," citing *Johnson*). Finally, in *Taylor v. Jones*, 653 F.2d 1193 (8th Cir.1981), the court of appeals upheld the district court's decision that the plaintiff, a black employee of the Arkansas Army National Guard, had been constructively discharged. The record revealed that white employees and members of the National Guard often used the terms "niggers" and "spooks" in the presence of the plaintiff and other black employees. The circumstances made clear that the racially derogatory remarks reflected hostility and racial animus. Because the plaintiff had been subjected to more than "isolated, casual ethnic slurs," the court concluded that the plaintiff had acted reasonably in resigning. 653 F.2d at 1198–1199. *See also* E.E. O.C. Decision No. 71–909, 3 Fair Empl. Prac.Cas. (BNA) 269 (1970) (supervisor's habitually referring to black employees as "niggers" would have rendered the resignation of the charging party, who was white, a constructive discharge under Title VII).

Both *Vaughn* and *Johnson* are clearly distinguishable from the present case. Although, unlike *Taylor*, the present case involved an "isolated" incident of discriminatory treatment, Binyon's alleged remarks to Plaintiff simply cannot be characterized as "harmless" or "casual." The malicious nature of those remarks is particularly evident in light of Binyon's juxtaposition of "human being" and "nigger." Moreover, Binyon was not one of Plaintiff's

co-workers; indeed, Binyon is not merely a supervisor, but also an officer of the corporation which owns the restaurant in which Plaintiff worked. Because we do not believe that, assuming that we felt compelled to follow the reasoning of *Vaughn* and *Johnson*, those cases would require us to dismiss Plaintiff's complaint, we now turn to a more thorough consideration of the question of whether we must find that Plaintiff was not confronted with an "aggravated situation," rendering his resignation unreasonable as a matter of law.

### III. *Racial Epithets*

The traditional attitude of the law toward the use of racial epithets is well reflected in the context of the tort of intentional infliction of emotional distress. In an often quoted article, Professor (later Judge) Magruder wrote in 1936 that "there is danger of getting into the realm of the trivial in this matter of insulting language. No pressing social need requires that every abusive outburst be converted into a tort; upon the contrary, it would be unfortunate if the law closed all the safety valves through which irascible tempers might legally blow off steam." Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv.L.Rev. 1033, 1053 (1936) (footnote omitted). Professor Magruder's views are echoed in the *Restatement:*

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt.

Restatement (Second) of Torts § 46 comment d, at 73 (1965).

The influence of Professor Magruder's article and of the *Restatement* is apparent in *Howard v. National Cash Register Co.,* 388 F.Supp. 603 (S.D.Ohio 1975), an employment discrimination case. In *Howard,* the plaintiff, a black man, brought an action under Title VII and § 1981 against his employer, a large corporation. The plaintiff, who was still working for the defendant at the time of the lawsuit, based his claims on the fact that he had been subjected to racially abusive treatment by his fellow employees; in particular, the word "nigger" had apparently been used by co-workers in the plaintiff's presence on several occasions. In the course of an extended discussion of the nature and effect of ethnic epithets, the court stated that, while the damage to sensitive people is "deep" and "real":

> The language of the factory and the language of the street have long included words such as "Greaser", "Dago", and "Spick", and "Kike" and "Chink" as well as "Nigger". In the past three years we have even adopted as a part of our folk lore a character who is prejudiced and biased against all persons other than of his own neighborhood, religion and nationality. We refer to such people now as "Archie Bunkers." The Archie Bunkers of this world, within limitations, still may assert their biased view.... The defendant in this case is charged by law with avoiding all discrimination; the defendant is not charged by law with discharging all Archie Bunkers in its employ. Absent a showing of something other than disrespect and prejudice by his fellow workers, plaintiff cannot bring himself within the terms of either ... § 1981 or [Title VII].

388 F.Supp. at 606. *See also Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.,* 690 F.2d 88, 91 (6th Cir.1982) (noting that the district court's decision, which was reversed on other grounds, had followed *Howard* ); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977) (per curiam) ("derogatory ethnic comments" which "were part of casual conversation ... [did not] constitute a violation of Title VII"); *Fekete v. United States Steel Corporation,* 353 F.Supp. 1177, 1186–1187 (W.D.Pa.1973) (employer

not liable under Title VII for the unauthorized harassment by its employees of the plaintiff because of his national origin).[6]

As suggested above, the present case is distinguishable from *Howard, Rowe, Cariddi,* and *Fekete* because the latter cases all involved uses of ethnic epithets which were not directly attributable to the employer or which were part of "casual conversation." Nevertheless, we believe that developments in various areas of the law which cast doubt on the continuing acceptability of the attitude toward ethnic slurs which *Howard* epitomizes warrant discussion. *See generally* Delgado, *Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling,* 17 Harv.C. R.–C.L.L.Rev. 133 (1982).[7] In *Contreras v. Crown Zellerbach Corporation,* 88 Wash.2d 735, 565 P.2d 1173 (1977) (en banc), for example, the Supreme Court of Washington reversed the trial court's decision dismissing the plaintiff's claim for intentional infliction of emotional distress based on derogatory ethnic remarks made by his fellow employees. The plaintiff, a Mexican-American, alleged that those remarks were attributable to the defendant, his former employer, because the defendant had failed to control its employees. In holding that the plaintiff's claim was legally sufficient, the court emphasized the fact that an employer's position of authority over its employees justifies imposing a higher duty on the employer than on others. 565 P.2d at 1176. *See* Restatement (Second) of Torts § 46 comment e (1965).

Although the court did not mention *Howard,* the following discussion of ethnic slurs in *Contreras* could well have been written as a response to the discussion in *Howard* quoted above:

As we as a nation of immigrants become more aware of the need for pride in our diverse backgrounds, racial epithets which were once part of common usage may not now be looked upon as "mere insulting language." Changing sensitivity in society alters the acceptability of former terms.... "Although the slang epithet 'nigger' may once have been in common usage, along with such other racial characterizations as 'wop,' 'chink,' 'jap,' 'bohunk,' or 'shanty Irish,' the former expression has become particularly abusive and insulting in light of recent developments in the civil rights' movement as it pertains to the American Negro. Nor can we accept defendants' contention that plaintiff, as a truckdriver must have become accustomed to such abusive language. Plaintiff's own susceptibility to racial slurs and other discriminatory conduct is a question for the trier of fact, and cannot be determined on demurrer." The same conclusion is compelled with regard to Mexican-Americans and the various slang epithets that may have once been in common usage regarding them. It is for the trier of fact to determine, taking into account changing social conditions and plaintiff's own susceptibility, whether the particular conduct was sufficient to constitute extreme outrage.

565 P.2d at 1177, quoting *Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 86 Cal. Rptr. 88, 468 P.2d 216, 219 n. 4 (1970) (en banc). Thus, the court in *Contreras* concluded that, in the context of the employment relationship, ethnic slurs are not, in the words of the *Restatement,* "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *See* 565 P.2d at 1176 n. 2.

Several courts in cases under 42 U.S.C. § 1983 have also refused to find that a plaintiff who has been the victim of abusive ethnic slurs is without a legal remedy. In *Harris v. Harvey,* 605 F.2d 330, 338 (7th

---

6. In *Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C.Cir.1981), the court noted that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action [under Title VII]," citing *Cariddi* and *Fekete.* *See also Rogers*

v. *E.E.O.C.,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

7. *See also Ware v. Reed,* 709 F.2d 345, 352 & n. 12 (5th Cir.1983).

Cir.1979), *cert. denied,* 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980), the Seventh Circuit held that defamatory ethnic remarks, made by a person acting under color of state law, can constitute a denial of equal protection and hence be actionable under § 1983. *See Stevens v. Tillman,* 568 F.Supp. 289, 293 (N.D.Ill.1983). *See also Holt v. Hutto,* 363 F.Supp. 194, 214 (E.D. Ark.1973), *modified,* 505 F.2d 194 (8th Cir. 1974) (prohibiting prison employees from making derogatory racial remarks to prisoners); *Allen v. City of Mobile,* 331 F.Supp. 1134, 1144–1145 (S.D.Ala.1971), *aff'd,* 466 F.2d 122 (5th Cir.1972), *cert. denied,* 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975 (1973) (prohibiting police department employees from referring to blacks as "niggers"). *But see Johnson v. Hackett,* 284 F.Supp. 933, 939–941 (E.D.Pa. 1968) (holding that derogatory racial remarks by police officers did not violate the plaintiff's constitutional rights). Judicial sensitivity to the harm which may be caused to members of minority groups by "mere language" is also evident in other contexts. *See Hamilton v. Alabama,* 376 U.S. 650, 84 S.Ct. 982, 11 L.Ed.2d 979 (1964) (per curiam) (reversing contempt judgment against a black woman who refused to answer questions at trial unless the prosecutor addressed her as "Miss Hamilton" rather than "Mary"); *In re Stevens,* 31 Cal.3d 403, 183 Cal.Rptr. 48, 645 P.2d 99 (1982) (en banc) (censuring state judge for using ethnic epithets and making derogatory comments about members of minority groups); *City of Minneapolis v. Richardson,* 239 N.W.2d at 203 (holding that police officers' use of the term "nigger" to refer to a black child constituted impermissible racial discrimination under state Human Rights Act). *See generally* Delgado, *supra,* at 160–162.

Returning to Title VII, we note that the Equal Employment Opportunity Commission has found that an employer violated the statute where a supervisory employee referred to the charging party, a black employee, as a "nigger," and the employer "failed to take reasonable steps to remedy ... [the] effects" of the remark. E.E.O.C. Decision No. 72–0779, 4 Fair Empl.Prac. Cas. (BNA) 317, 318 (1971).[8] *See* 3 A. Larson and L. Larson, *Employment Discrimination* § 84.10, at 17–1—17–2 (1983). *Cf. Grubb v. W.A. Foote Memorial Hospital, Inc.,* 533 F.Supp. 671, 674–676 (E.D. Mich.1981) (finding that employer violated Title VII and § 1981; among other things, supervisor, referring to other employees, told the plaintiff, a black man, "to fire those niggers").

Interestingly, though, the case which is most similar to the case before us, *Imperial Diner, Inc. v. State Human Rights Appeal Board,* 52 N.Y.2d 72, 436 N.Y.S.2d 231, 417 N.E.2d 525 (1980), was not brought under Title VII, but under a state anti-discrimination statute, the relevant language of which is essentially identical to that of Title VII. In *Imperial Diner,* the complainant, a Jewish woman, was employed as a waitress by the respondent restaurant. After the complainant was reassigned from a counter station to a table station in the restaurant, she thanked the "president" of the restaurant for the reassignment, mistakenly believing that he had been responsible for it. The president "responded with an obscene antisemitic remark to the effect that the complainant thought she was something special because she was Jewish, 'Just like all the other f_____ing Jewish broads around here." 436 N.Y.S.2d at 233, 417 N.E.2d at 527. When, like Plaintiff in the present case, the complainant protested the president's comments, the president "told her that she had heard correctly; that all the 'f_____ing Jewish women' at the diner 'think they are something special and deserve more than the others.'" *Id.* The president ignored the complainant's request for an apology, and the complainant then left the restaurant and went home. The president later asked the complainant to return to work,

---

**8.** We are aware that, as discussed above, the fact that the employer has violated Title VII or § 1981 does not necessarily mean that the employee was confronted with an "aggravated situation" rendering his or her resignation, as a matter of law, not unreasonable.

but she told him that she would not do so unless he apologized to her in front of the people who had heard his earlier remarks. The president replied that he would never apologize, and the complainant did not go back to work. *Id.*

Based on these facts, the Court of Appeals of New York upheld the finding of the State Division of Human Rights that both the restaurant and its president had violated the anti-discrimination statute. The court found no error in the administrative decision that the president's remarks constituted impermissible employment discrimination on the basis of religion, or in the decision that the complainant had been constructively discharged under the statute. In a passage strikingly pertinent to the present case, the court noted that:

> As far as subtlety is concerned the case now before us is startling because here the employer's contempt for complainant, and his other female employees of her religion or creed was proclaimed crudely and openly, not only to her but to all within her hearing. This type of vilification is humiliating, not only when it is done wholesale, but also and perhaps especially, when it is directed at a lone individual in an isolated incident.

436 N.Y.S.2d at 234, 417 N.E.2d at 528. The court also emphasized the fact that, although the president asked the complainant to return to work, the president (as is implicitly alleged with respect to Binyon in the present case) gave no indication that his attitude toward the complainant would change. 436 N.Y.S.2d at 235, 417 N.E.2d at 529.

■ We find the reasoning of the court in *Imperial Diner* to be persuasive, and we believe that that reasoning is fully applicable to the case before us. Indeed, we believe that Plaintiff's complaint presents, if anything, an even stronger case for relief than that of the complainant in *Imperial Diner,* because of Binyon's alleged explicit distinction between "human beings" and "niggers."

In sum, we refuse to characterize Binyon's alleged remarks as "mere insults,"

or even as "ordinary" discrimination. Such comments "are different qualitatively because they conjure up the entire history of racial discrimination in this country." Delgado, *supra,* at 157 (footnote omitted). Language such as that allegedly used by Binyon, when addressed to black people, as Chief Justice Warren wrote in a different context, "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Board of Education of Topeka,* 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). This is not simply a case, for example, of unequal pay for equal work. On the basis of Plaintiff's complaint, we cannot say that, as a matter of law, Plaintiff was not confronted with an "aggravated situation," and thus acted unreasonably, when he allegedly walked out of Defendant's restaurant on November 16, 1982. We find that the question of whether Plaintiff was constructively discharged by Defendants, in violation of Title VII and § 1981, must be left to the trier of fact.

### Conclusion

For the reasons stated above, Defendants' motion to dismiss Plaintiff's complaint is denied. Defendants are ordered to file an answer within ten days after they receive notice of this decision.