JACK THOMPSON OLDSMOBILE, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 81–2013.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1982.

Decided July 7, 1982.

J. Paige Clousson, Chicago, Ill., for petitioner.

Paul Bateman, Elliott Moore, N.L.R.B., Washington, D. C., for respondent.

Before ESCHBACH, Circuit Judge, NICHOLS,[*] Associate Judge, and POSNER, Circuit Judge.

ESCHBACH, Circuit Judge.

Petitioner Jack Thompson Oldsmobile seeks to set aside an order of respondent National Labor Relations Board issued May 15, 1981. The Board cross-applies for enforcement of its order. The Board found violations of sections 8(a)(1), (a)(3), (a)(5) and 8(d) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3), (a)(5) and 158(d), based on unilateral revision of sales commission rates at petitioner's auto dealership and the discriminatory discharge of salesperson Robert Manhatton. Our jurisdiction is founded on section 10(e) of the Act, 29 U.S.C. § 160(e), the alleged unfair labor practices having occurred in Oak Lawn, Illinois. For the reasons which follow, we deny enforcement of the order insofar as it is predicated on the rulings challenged herein by petitioner. In all other respects, the order will be summarily enforced.

I

■ Pursuant to unfair labor practice charges filed by the bargaining representative of petitioner's sales force, the Association of Professional Salesmen (union), an evidentiary hearing was held before an administrative law judge (ALJ) on April 1, 1980. In a decision dated August 28, 1980, the ALJ found against petitioner and recommended that it be ordered to reinstate and award back pay to Mr. Manhatton, reinstitute its pre-September 1, 1979 method of computing sales commissions, bargain in good faith with the salespersons' union representative, cease and desist from making unilateral changes in terms and conditions of employment, and post corrective

* The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, sitting by designation.

notices. A three member panel of the Board affirmed the ALJ's findings and conclusions and adopted the recommended order with certain modifications not at issue in this action. The facts found by the ALJ and affirmed by the Board are as follows.

Since 1975, petitioner's salespersons have been represented by the union, and the terms and conditions of their employment have been governed by successive collective bargaining agreements. In addition to the specific provisions in the agreement, ever since 1972, petitioner has maintained a policy—which neither the Board nor the union challenges—of requiring its salespersons to "turn over" all auto purchasers to the business manager upon consummation of a sale, in order to allow the manager to offer dealer financing and insurance packages to each purchaser. In 1978, this "turnover" requirement was reduced to writing and incorporated in the "Salesmen's Policy Manual." Nevertheless, the employer subsequently discovered that many car buyers still were not being referred to the business manager. Consequently, the employer decided to withhold one-half of the sales commission with respect to sales completed without turning the purchaser over to the business manager. This decision was announced at a September 1, 1979 sales meeting. Neither at that time nor thereafter did the employer offer to bargain about this decision with the salespersons' union representative.

Between September 1 and 5, 1979, salesperson Manhatton, who had been advised of the new policy regarding the turnover rule, "turned over" customers as required. On September 5, however, under rather extenuating circumstances, Manhatton sold a truck to a customer named Warner without referring Warner to the business manager.[1] When Manhatton later discovered that his commission on the Warner sale had been halved, he went to the office of the employer's general manager, Charles Thompson, and asked Thompson to reinstate the full commission. Thompson stood by the company's decision to halve the commission and adamantly refused to discuss the matter further. When Manhatton protested that the decision was invalid under the union contract, Thompson shouted that he did not care about the union and that if Manhatton did not like it he could "get the hell out."[2]

1. The circumstances of the Warner sale are set forth in the ALJ's decision:

> At the time of the incident in question, Manhatton was splitting his commissions with salesman Charles Boerst, in accordance with a practice approved by the Respondent. Boerst was on vacation. On the evening of September 4 Manhatton showed a truck to a customer named Warner. At 12:30 p. m. on September 5 Warner came to Manhatton's office at the dealership, presented a check for the truck, and insisted on immediate delivery. Manhatton was the only salesman present at the time, and had three other customers in his office while he was in the process of concluding a sale to one of them. Warner brushed aside Manhatton's references to dealer financing and insurance, stating that he had his own insurance and desired no financing. In his haste, Warner rejected the usual offer of dealership assistance in purchasing license plates. According to Manhatton he attempted to locate a manager, in order to comply with the turnover policy, but, since it was lunch time, he was unable to do so. He testified that General Manager Charles Thompson, Assistant General Manager Sisson, and Business Managers John Thompson and George Niemeyer were all ab-

> sent, and that one of the other three customers in his office, who desired dealer financing, was awaiting their return. Since Warner did not desire further assistance and was in a hurry, Manhatton concluded the cash transaction and delivered the vehicle at approximately 12:45 p. m.

2. The circumstances of Manhatton's confrontation with Thompson, as found by the ALJ, were as follows:

> At about 4:45 p. m., just before the dealership closed for the day, Manhatton confronted Charles Thompson with the commission reduction. Thompson confirmed that the commission had been reduced because Manhatton had not "turned over" Warner. Thompson ignored Manhatton's claim that no business manager was available at the time, and that Warner was in a hurry. He stated that it did not make any difference, and when Manhatton renewed his efforts to explain, retorted, "I don't want to hear it." Then the conversation became heated, with both men raising their voices. Manhatton insisted that withholding money from an employee was unlawful. Thompson said, "I'm doing it." Then Manhatton stated, "You can't do that, because that is one of the reasons we have a

Manhatton exited Thompson's office shortly thereafter. His subsequent efforts to come to terms with Thompson proved unsuccessful. On September 14, 1979, Manhatton returned his demonstrator automobile to the dealership and executed a form which enabled him to receive the money in his pension fund.[3] The parties seem to agree that Manhatton was no longer considered an employee at this point. There is considerable dispute, however, as to whether he left voluntarily or was fired.

In November of 1979, in a further effort to promote the sale of its dealer financing and insurance packages, the dealership hired an outside firm to manage its financing and insurance transactions. As a result of this new arrangement, the salespersons' net earnings from automobile sales were reduced.

The ALJ held that the introduction of the turnover-enforcement policy was an unlawful "unilateral change" in the terms and conditions of employment. The ALJ further held that Manhatton's confrontation with Charles Thompson amounted to an unlawful "constructive discharge," inasmuch as Manhatton had been subjected to a Hobson's choice of "accepting the enforcement of an unlawful change, or quitting." The transfer of responsibility for financing and insurance sales to the outside firm was also deemed an unlawful unilateral change.

We cannot sustain the Board's ruling that the imposition of the 50% commission-withholding program was unlawful. Therefore,

insofar as the Board's order is based on findings that the September 1, 1979 commission rule was an unlawful unilateral change and that Manhatton was unlawfully "constructively discharged," the order will be set aside. We reach this result because we have concluded that the Board abused its discretion by failing to consider whether the employer was authorized by the collective bargaining agreement to require its salespersons to observe the turnover rule as a condition precedent to the receipt of a commission on the sale of an automobile.

II

The Board adopted the ALJ's conclusion that the commission-reduction program was an unlawful unilateral change because it changed "the method by which its salesmen's commissions are computed . . . ." This presupposes, without any analysis, that adherence to the turnover rule was not a valid precondition to the receipt of a commission. We are mindful that an employer may not make unilateral changes in regard to wages, hours and other vital terms and conditions of employment. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). *See generally, Allied Chemical Workers, Local 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). We also recognize that the Board's "judgment as to what [constitutes] a mandatory bargaining subject is entitled to considerable deference." *Ford*

union contract," to which an enraged Thompson shouted "I don't give a s___ about the Union, and if you don't like it, get the hell out." Manhatton stalked out of the office and headed toward his automobile, but, after thinking about the matter for a time, returned to Thompson's office and asked "Is this really the way you want it?" Thompson replied "Yes."

**3.** The ALJ's chronicle of Manhatton's reconciliation efforts is as follows:

On September 10 Manhatton phoned Thompson, who was not in. He called again on September 11, and after a brief period during which Thompson's secretary left the phone, was invited to come in and talk to Company President John Thompson in person. When Manhatton arrived, however, John Thompson

was not there. Manhatton returned home and continued his efforts to call John Thompson at various times of the day until September 14 when he returned to the Respondent's premises and met Charles Thompson in the used car lot. Manhatton asked if they could work out their difficulties, but Thompson declined. Then Manhatton asked how he obtained his money from the pension fund if he was no longer working there. Thompson obtained the forms, which his secretary typed and Manhatton signed. Manhatton asked for his reduced share of the Warner commission which Thompson refused to pay. After turning in his demonstrator automobile, Manhatton left the premises for the last time.

*Motor Co. v. NLRB*, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979). Nevertheless, while it is apparent that the employer's commission-withholding program was necessarily linked to the salespersons' income prospects, we question the Board's summary conclusion that it constituted a "change" in the wage structure.

The commission system at issue here is quite unlike a conventional hourly wage scale. It is more analogous to a piece-work system of remuneration. Thus, any analysis of the true wage structure should not rest solely upon the commission percentages, but must also identify the elements of the tasks upon which the commissions are based; these elements might be defined as the contractual preconditions to the receipt of a sales commission. In summarily concluding that the employer's new method of enforcing the turnover rule was a change in the commission structure, the Board's analysis fails to consider that the turnover procedure may well have been a valid precondition to the receipt of a commission. If that is true, then we would have great difficulty in viewing the turnover-enforcement rule as a "change" in the established wage structure.

Even if the turnover procedure is a valid precondition to the receipt of a commission, the employer's mode of enforcing it might be deemed invalid under traditional contract principles as a "penalty" if the amount of the forfeiture is disproportionate

to the loss actually attributable to the employee's breach of contract. *See* 5 A. Corbin, Contracts § 1057 at 333–34 (1964 ed.). On the existing record, however, the Board's decision cannot be sustained on this alternative ground for there is no indication as to whether the 50% commission reduction is excessive when considered in light of the employer's injury relating to the loss of "turnover" customers.

In addressing the union's charges of unlawful unilateral changes in terms and conditions of employment, the Board assumed the obligation of construing the applicable collective bargaining agreement. In this case, however, the Board has utterly failed to examine the agreement to determine whether it allows the employer to make the turnover procedure a precondition to receipt of a commission.

The brief of the Board's counsel, in an effort to cure the Board's omission, maintains that observance of the turnover rule is not a contractual precondition to the receipt of a commission.[4] Petitioner's brief advances a contrary interpretation of the collective bargaining agreement. We decline the invitation to resolve this controversy. While the Board's failure to undertake the requisite analysis of the agreement constituted an abuse of discretion, it would be inappropriate in the present posture of this case for us to substitute our analysis for that of the Board. The initial interpreta-

---

4. Article XIV of the collective bargaining agreement provides, in pertinent part, as follows:

*Section 1.* In addition to any commissions earned, salesmen shall receive $325.00 per month as salary provided that the salesman has a minimum of twelve (12) deliveries during that month.

*Section 2.* Commissions on the sale of new cars shall be as follows:

a) Invoice through $250.00 over invoice     35.00

b) $251.00 over invoice through
    $400.00 over invoice     25%

c) Over $400.00 above invoice     50%

*Section 3.* Commissions on the rate of used cars shall be as follows: twenty-five percent (25%) of the gross profit over the Actual Cash Value of the vehicle plus a $100.00 lot fee and any additional preparation charges.

*Section 4.* If any customer to whom the salesman has delivered a car should purchase financing or insurance through the Company F&I Department, that salesman shall receive a bonus of 5% of the finance reserve and/or 5% of the insurance premiums where applicable.

\*    \*    \*    \*    \*    \*

*Section 6.* A commission shall not be earned until all stipulated monies are paid and delivered to the dealership or approved by the finance company and the salesman has delivered all necessary documents required to complete the transaction of the dealer.

*Section 7.* It is understood that any special bonuses, contests, awards, or price arrangements to be conducted in the dealership shall be at the sole discretion of the dealers and

tion of the contract, we believe, should be rendered by the Board,[5] subject to its informed discretion as to the scope of mandatory bargaining issues. *See Ford Motor Co. v. NLRB, supra*, 441 U.S. at 495, 99 S.Ct. at 1848.[6]

## III

█ The next subject for review is the Board's ruling that Manhatton was the victim of an unlawful "constructive discharge," which is one variant of discriminatory discharge. This court has recently identified two elements that must be satisfied to establish a constructive discharge: first, the employer's challenged conduct must be so intolerable that the employee is forced to quit; second, the conduct must be undertaken with the intention of encouraging or discouraging membership in a labor union. *NLRB v. Sure-Tan, Inc.*, 672 F.2d 592, 600 (7th Cir. 1982). Since we decline to sustain the Board's ruling that the employer's turnover-enforcement rule was unlawful, we necessarily reach the same result regarding the Board's conclusion that the rule constituted a working condition so intolerable that it forced Manhatton to resign. We express no view as to whether

the other elements of a constructive discharge were satisfied in this case.

## IV

Finally, we note that petitioner does not take exception in this forum to the Board's ruling that the transfer of responsibility for the financing and insurance transactions to an outside firm was an unlawful unilateral change. On its face, that ruling appears to be correct. *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). *But cf. First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981) (partial shut down of business for economic reasons not necessarily a mandatory subject of bargaining). In any case, insofar as the Board's order pertains to the restructuring of the finance and insurance department, it will be summarily enforced. *See Dreis & Krump Manufacturing Co. v. NLRB*, 544 F.2d 320, 325 (7th Cir. 1976).

## V

Accordingly, we grant enforcement of the Board's order insofar as it is based on a determination that the employer violated

---

may be instituted or discontinued at the option of the dealer.

5. The employer argues that since the collective bargaining agreement provides for binding arbitration as to its interpretation and application, the Board should defer the unilateral change issues to arbitration. However, the allegation of unilateral change regarding the turnover rule is closely related to the allegation that Mr. Manhatton was discriminatorily discharged. The Board follows a policy of refusing to defer to arbitration when claims of discriminatory discharge (requiring interpretation of the National Labor Relations Act) are interwoven, as here, with claims sounding in breach of the collective bargaining agreement. *See Great American Transportation Corp.*, 228 N.L.R.B. 808 (1977); *Roy Robinson Chevrolet*, 228 N.L.R.B. 828 (1977). "Our standard of review on this matter is simply whether the Board abused its discretion by not deferring, ..." *Caterpillar Tractor Co. v. NLRB*, 658 F.2d 1242, 1245 (7th Cir. 1981). We cannot conclude that the Board abused its discretion in this regard.

6. In the proceedings below, the Board apparently concluded that upon entering into an

agreement which fixed the commission rates, the employer thereby waived any right to enforce company rules by means of a monetary sanction. Even if it is true that the employer is not entitled under the collective bargaining agreement to enforce ordinary company work rules by means of a monetary sanction, that does not mean that the employer is required to pay a full commission to a salesperson who has failed to perform one of the contractual preconditions to a commission. The question of the employer's power to enforce work rules by means of a monetary sanction is quite distinct from the question of the employer's right to withhold part of a commission for failure to *earn* a full commission. We express no view as to the extent of the employer's disciplinary powers under the management prerogative clause in the collective bargaining agreement. If the question should arise on remand, the Board should consider whether the agreement allows the employer to withhold part of a commission as a disciplinary measure for violating the turnover requirement, notwithstanding the fact that the commission rates are fixed in the agreement.

sections 8(a)(1) and (5) and 8(d) of the National Labor Relations Act by unilaterally delegating responsibility for the financing and insurance transactions to an outside firm. However, insofar as the order is based on determinations that the September 1, 1979 turnover rule was an unlawful unilateral change and that Robert Manhatton was unlawfully discharged, we grant review, deny enforcement and remand to the Board for further proceedings consistent with this opinion.