**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AND ITS LOCAL NO. 1712, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Sun Electric Corporation & Peter Diedrich, Intervening Respondents.**

No. 83–1653.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1984.

Decided April 16, 1984.

As Amended April 17, 1984.

---

Stanley Eisenstein, Katz, Friedman, Schur & Eagle, Chicago, Ill., for petitioner.

Richard Cohen, Elliott Moore, N.L.R.B., Washington, D.C., for respondent.

James Baird, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for Sun Electric Co.

Michael E. Avakian, Edward F. Hughes, Center on National Labor Policy, Inc., North Springfield, Va., for Diedrich.

Before PELL, CUDAHY and POSNER, Circuit Judges.

CUDAHY, Circuit Judge.

On January 19, 1983, the National Labor Relations Board (the "NLRB" or the "Board") affirmed an Administrative Law Judge's dismissal of a complaint against Sun Electric Corporation ("Sun"). Petitioner, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, and its Local No. 1712 (the "Union") claims that the NLRB's decision is not supported by substantial evidence. The Union also asserts that the NLRB failed to address certain key issues in the case. Finding ample legal and factual support for the NLRB's decision, we deny the petition for review.

## I.

The Union claims that Sun refused, in 1980, to bargain in good faith over pension proposals submitted by the Union in 1979, allegedly in violation of § 8(a)(5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(5).[1] To understand the events leading up to this dispute we must recount the negotiations over the 1977–80 labor agreement between Sun and the Union.

Sun manufactures auto parts at 65 facilities nationwide, employing approximately 2500 people. At all times material to this case, the Union represented about 300 employees at Sun's Crystal Lake, Illinois, facility. These employees historically were covered by Sun's company-wide pension plan, but during the 1977 contract renewal negotiations, the Union made proposals to improve the pension plan. Sun, for several reasons, was unwilling to consider the Union's 1977 proposals. Sun had, apparently, recently completed a review and revision of its pension plan to bring it into compliance with the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. Further, Sun feared that if it took the necessary time to review the Union's proposals, it would delay reaching an agreement on the contract as a whole. So, in response to the Union's proposals, Sun proffered the following Side Letter, which was designed to ensure that the parties would have adequate time to bargain over pensions in 1980. The Side Letter also, and very importantly, makes any changes in benefits retroactive to the effective date of the 1977 contract:

> The parties agree to consider changes to the Pension Plan at the termination of the Agreement in November 1980. The Union agrees to notify the Company of desired changes twelve (12) months prior to the expiration of the 1980 Contract and Company agree [sic] that any changes negotiated at that time will retroactively affect any employee who retires or first receives benefit payments during the term of this new Agreement.

In July, 1979, the parties once again began corresponding over the Union's desire to improve pension benefits for its members. On July 23, Roy Dahlke, the Union's chief negotiator, wrote to Sun's personnel director, stating that he wanted to meet with management to discuss the pension plan. Peter Shukas, the personnel director, replied on July 25, asked that any pension

---

**1.** Section 8(a) of the Act (29 U.S.C. § 158(a)) provides:

> It shall be an unfair labor practice for an employer—
>
> \* \* \* \* \* \*
>
> (5) to refuse to bargain collectively with the representatives of his employees ....

Section 8(d) of the Act (29 U.S.C. § 158(d)) provides in relevant part:

> [To] bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, ... but such obligation does not compel either party to agree to a proposal or require the making of a concession ....

proposals be directed to him in writing and further stated that these written proposals would be forwarded "to the Sun Pension Committee for study and review." Thereafter, on August 6, 1979, Dahlke submitted, for Sun's study, sixteen proposals which he characterized as "major points that need correction as soon as possible." The August 6 letter specifically reserved "the final right to determine what [the Union's] Pension Proposals might be in the 1980 negotiations." The Union was apparently very much concerned with preserving its right to change the proposals because the letter further stressed: "the very clear understanding that this [proposal] does not preclude the Union from any Pension Proposals, it might make in 1980." On September 20, 1979, Dahlke again wrote to Shukas and added one additional pension proposal. Shukas, meanwhile, turned the proposals over to Henry Stark, Sun's chief negotiator. Stark decided to do nothing with the proposals. He made no response to the Union regarding the proposals, nor did he have them studied to determine feasibility or cost. Further, he did not inform the Union of the decision to take no action on the proposals.

On September 30, 1980, more than a year after Sun had received the Union's pension proposals, bargaining for a new contract began. The Union submitted a comprehensive written proposal which incorporated the previously made pension proposals. At some time between September 30 and October 13, Stark mentioned to the company Sun had hired to conduct a comprehensive review of its pension program some of the Union's pension proposals. On November 5, Sun submitted a comprehensive contract proposal which effectively rejected all of the Union's proposals and modified the old contract only to the extent that it would have allowed Sun to unilaterally modify the existing pension plan. On November 12, Stark informed the Union that it needed

flexibility with regard to pensions because the entire pension plan was under review. Dahlke became angry, apparently because he foresaw a repetition of Sun's 1977 reluctance to bargain over pensions.[2] Dahlke reiterated the Union's sixteen point proposal and at this time Sun agreed to six of the points, partially agreed to two more, rejected one and agreed to cost out seven others.

The next negotiating session occurred two days later on November 14. Sun made a new contract proposal which the Union rejected. The Union countered with a proposal for a six-month extension of the existing contract with continued bargaining over four specific issues, including pensions. Sun rejected this offer and offered a new proposal which the Union rejected. The Union then proposed a forty-two month extension of the current contract, which Sun rejected. The contract expired on November 17 and the Union called its members out on strike. Stark testified that at this time actuarial work on the Union's pension proposals was halted because he viewed the Union's offer to extend the existing contract as a withdrawal of the earlier pension proposals. A study of the sixteen points was finally completed on February 11, 1981, after they were resubmitted to Sun's actuaries pursuant to a Union proposal made during the strike.

Meanwhile, in September and October, 1979, Aetna Life Insurance Company, carriers of Sun's pension plan, advised Sun to make certain changes in the plan. Sun agreed to make only those changes that its attorneys found were required by federal law. The amendments were executed on October 30, 1980.

On July 23, 1981, the regional director of the NLRB filed a complaint against Sun, alleging that between September 30, 1980 and a "certain but unknown date in 1981," Sun refused to bargain in good faith by failing to respond to the Union's pension

2. Dahlke interpreted Stark's comment that the Pension Plan was under review as referring to the Union's proposals which Sun already had had for over a year. Stark testified, however, that the review he had referred to was a general review of Sun's entire retirement program and not a review of the Union's proposals. We do not find it necessary to resolve this conflict because neither version would change the result of this case. *See infra* Part II.

proposals. The complaint was later amended to include allegations that the strike was an unfair labor practice strike and that the failure to reinstate the strikers when the strike ended was an unfair labor practice. The complaint was tried to an Administrative Law Judge ("ALJ") who found that Sun bargained in good faith over pensions. The NLRB adopted the ALJ's order as its own and thus dismissed the complaint.

## II.

■ We begin our discussion mindful of the narrowness of our review of NLRB decisions. We accept the Board's factual findings if they are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456, (1951); *NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831 at 835 (7th Cir.1984). Further, when the analysis of the facts as found implicates the Board's expertise, we must "recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). Thus, in analyzing the NLRB's application of § 8(a)(5) to the facts of this case, we should defer to reasonable Board conclusions. *See NLRB v. City Disposal Systems, Inc.*, — U.S. —, —, 104 S.Ct. 1505, 1516, 79 L.Ed.2d 839 (1984) ("[T]he doctrine constitutes a reasonable interpretation of the Act. Accordingly, we accept the Board's conclusion."); *Giddings & Lewis, Inc. v. NLRB*, 675 F.2d 926, 929 (7th Cir.1982) (Board's interpretation of the Act upheld if reasonable). *See also NLRB v. Yeshiva University*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980); *Id.*, 444 U.S. at 693, 100 S.Ct. at 867 (Brennan, J. dissenting); *NLRB v. L.B. Priester & Son, Inc.*, 669 F.2d 355, 359 (5th Cir. 1982); B. Meltzer, LABOR LAW 103 (2d ed. 1977). *Cf. NLRB v. Acme Die Casting Corp.*, 728 F.2d 959 at 961–963 (7th Cir.1984).

The Union's claim that Sun did not bargain in good faith over pensions amounts in considerable part to a strong objection to the Board's refusal to impose a duty on Sun to conduct a feasibility study of the Union's pension proposals before the onset of bargaining in 1980. The Union asserts that the Side Letter required "Sun to come to the bargaining table in 1980 prepared to discuss, negotiate in good faith and specifically respond to the Union's 1979 pension proposals." Petitioner's Brief at 16.

■ There are at least three insurmountable problems with this contention. First, the complaint in this case alleges a violation of § 8(a)(5) beginning on September 30, 1980, the date bargaining began. Thus, strictly speaking, any failure by Sun to act before September 30, 1980, is outside the scope of the case. We note additionally that in February, 1981, when the parties were near settlement, Sun's actuary needed only five days to study the proposals. Thus, if the Union had in bargaining insisted immediately on the sixteen points, Sun's failure to study the proposals before bargaining began would have worked only a slight delay. Second, the Side Letter itself does not explicitly require any pre-bargaining action by Sun. The Union argues vehemently that Sun must have been required to study the proposals in advance of bargaining; otherwise the Union's promise to submit proposals one year in advance was not supported by consideration and the Side Letter was completely unilateral. Sun answers this contention persuasively by noting that Sun promised to apply any 1980 pension changes retroactively to any employee who retired during the 1977 contract period, thus supplying consideration for the Union's promise to submit proposals twelve months in advance.

Third, the Board, in concluding that Sun did not violate § 8(a)(5) by failing to study the proposals prior to bargaining, relied on the fact that the Union's sixteen proposals were far from firm. In this respect, the NLRB, because of its familiarity with the everyday realities of collective bargaining, is entitled to some deference in evaluating what sort of Union proposal should be expected to trigger a prompt and thorough

study by management. We are reluctant to disturb a Board finding that depends in considerable part on its experience and expert knowledge. Even if we were to conclude that Sun would have behaved more honorably and responsibly by studying the pension proposals in advance of bargaining, the Board could reasonably find that the Side Letter did not require Sun to do so.

■ The Union urges us to remand the case for further findings because the NLRB failed to state explicitly whether the Side Letter imposed any duties on Sun vis-a-vis bargaining over pensions. The Union correctly points out that if the Board does not explain its decision clearly enough to allow effective judicial review, we must remand the case. *See Saylor v. United States Department of Agriculture*, 723 F.2d 581, 584 (7th Cir.1983). However, *Saylor* does not require the administrative agency to explain *ad nauseam* the impact and consequence of each piece of evidence before it. It is easy to discern from the Board's order the factors it relied on in determining that Sun bargained in good faith over pensions. These factors include the tentativeness of the formulation of the Union's proposals, the frequency with which Sun proffered comprehensive contract proposals, Sun's willingness to discuss the sixteen point plan on November 12, when the Union indicated that the sixteen points were firm, and the continued bargaining after the strike.[3]

■ The NLRB chose to apply § 8(a)(5) to the facts in this case by examining the totality of the circumstances surrounding the bargaining over pensions. *See NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). We will not disturb that choice unless it is inconsistent with the Act. *See Yeshiva University, supra*, 444 U.S. at 691, 100 S.Ct. at 867. And *Insurance Agents, supra*, tells us that it is

proper to determine whether there has been good faith bargaining by examining the "conduct of the parties as a whole." *Id.*, 361 U.S. at 498, 80 S.Ct. at 432. The NLRB's decision in this case reveals that, upon careful consideration of the entire course of bargaining, the Board found that Sun did not engage in bad faith or "surface" bargaining. We find ample support for these conclusions. The Union has focused almost exclusively on the specific issue of the Side Letter and thus has not effectively impugned the NLRB's conclusion.

The Union argues that *Jack Thompson Oldsmobile, Inc. v. NLRB*, 684 F.2d 458 (7th Cir.1982), supports a requirement that the Board state explicitly what effect the Side Letter had on Sun's bargaining duties. In *Jack Thompson Oldsmobile*, we criticized the NLRB for failing to examine the collective bargaining agreement. However, that case involved a charge of unlawful unilateral changes in the terms and conditions of employment, and thus a careful reading of the existing collective bargaining agreement was vital to the proper resolution of the case. *Id.*, 684 F.2d at 462. Here, contrary to the Union's protests, the Side Letter's effect is not in and of itself the sole determinant of whether Sun bargained in good faith. Rather, as noted, the totality of the circumstances must be examined.

■ The Union would have us analyze this case under breach of contract principles, but even if Sun's failure to cost out the proposals amounted to a breach of contract, it does not necessarily follow that such a breach would be a violation of § 8(a)(5). The record clearly supports the Board's finding that Sun bargained in good faith on the *subject* of pensions. Sun's failure to study the pension proposals before bargaining began was, at most, a *procedural* default which, as noted, could pre-

---

**3.** Sun, in its brief, argues that the Union withdrew its sixteen points when, during negotiations, it proposed extending the contract. The NLRB, however, did not rely on that proposition and neither can we because to do so would violate the rule that we must review agency

decisions on the basis only of the reasons relied on by the agency. *See Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Saylor v. United States Department of Agriculture, supra*, 723 F.2d at 582.

sumably have caused only a minor delay. The Board was entitled to analyze the totality of the circumstances surrounding the pension bargaining. Thus, the Union's extensive submissions with regard to the effect of the Side Letter cannot be determinative and, in fact, are not necessarily highly persuasive as to the overall circumstances.[4]

 The Union also alleges that Sun's unilateral amendment of its pension plan in October, 1980 ("Amendment 6"), violated Sun's duty to bargain in good faith. Sun responds that these changes were mandated by federal law and the Board agrees. The ALJ relied on Stark's testimony to that effect and nothing in the record indicates that the ALJ undertook independent legal research to support this conclusion. Sun in its brief cites no legal authority to support the claim that Amendment 6 was required by law. Further, while certain of the provisions of Amendment 6 refer to the provision of federal law by which they were mandated, many do not. However, the ALJ's order also characterizes these changes in the pension plan as "innocuous," and the Union has not challenged that characterization. More importantly, Stark's testimony and documentary evidence in the record tend to show that Sun believed that changes to its pension plan were legally required and that Sun believed, based on advice of counsel, that only those changes actually required by law were made. The NLRB concluded

that, even if the changes were not legally required, they could not have contributed to the strike since the Union had already been on strike for more than six months when it learned of the changes. With respect to this issue, the NLRB found that, because the changes did not cause the strike, the strike was not an unfair labor practice strike and, apparently, the Union would not be entitled to relief. Moreover, the 1977 agreement allowed Sun to make changes in the plan to comply with federal law, and the Union does not contend that it complained to Sun about the contents of Amendment 6. In these circumstances, the NLRB was entitled to find that the adoption of Amendment 6 was not a violation of § 8(a)(5).[5]

### III.

Therefore, given the entire course of bargaining, the NLRB's conclusion that Sun bargained in good faith over pensions is legally sustainable. Further, upon a careful review of the record, we have found ample support for the Board's determinations of fact. Thus, finding the NLRB's application of § 8(a)(5) well within the parameters of the statute, we deny the petition for review.

<hr>

4. We express no opinion on whether Sun's failure, for a full year, to take any action on the Union's proposals breached the agreements embodied in the Side Letter. The NLRB determined that, for § 8(a)(5) purposes, the proposals were too indefinite.

5. We have before us, together with the merits, the Union's motion to dismiss Peter Diedrich, a Sun employee, as an intervenor. During the pendency of the case, Diedrich was promoted to a supervisory position outside the bargaining unit. The NLRB takes the position that if a party is promoted during the pendency of a petition, that party does not lose standing to bring a petition. *See Weyerhauser Timber Co.,* 93 N.L.R.B. 842, 843–44 (1951). In the circumstances of this case we are inclined to honor the NLRB's practice and allow Diedrich to proceed as an intervenor. Therefore, the Union's motion is denied.

In any event, our decision to allow Diedrich to remain an intervenor is not prejudicial to the Union because we disagree with Diedrich's argument that the case has been mooted by the subsequent employee election in which the current Sun employees voted against representation by the Union. Despite contrary indications in the NLRB's order, it is not certain that, even if a violation of § 8(a)(5) were found, the NLRB would decline to find the strike to have been an unfair labor practice strike. Therefore, in light of the NLRB's broad discretion to fashion appropriate remedies, we are unwilling to assume that, if a violation was found, the NLRB would not have included the now decertified union in a remedial scheme. *See Farmers Energy Corp. v. NLRB,* 730 F.2d 1098, 1102 (7th Cir.1984). Thus, the case is not moot.