**JONES DAIRY FARM,**
**Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD,**
**Respondent/Cross–Petitioner,**

and

**Local 538, United Food and Commercial**
**Workers Union, AFL–CIO–CLC,**
**Intervening Respondent.**

**Nos. 89–2512, 89–2821.**

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1990.

Decided Aug. 7, 1990.

Herbert P. Wiedemann, Foley & Lardner, Milwaukee, Wis., for petitioner/cross-respondent.

Aileen A. Armstrong, N.L.R.B., Appellate Court—Enforcement Litigation, Joseph Oertel, Paul J. Spielberg, N.L.R.B., Washington, D.C., George F. Squillacote, N.L.R.B., Milwaukee, Wis., for respondent/cross-petitioner.

Kenneth R. Loebel, Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, Milwaukee, Wis., for intervening respondent.

Before CUDAHY, COFFEY and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

On June 15, 1989, the National Labor Relations Board (the "Board," the "NLRB") ordered Jones Dairy Farm ("Jones") to cease and desist from implementing a mandatory "work hardening" program. Jones asks us to review and set aside the Board's order; the Board cross-petitions for enforcement of its order.

Jones raises two points in its petition. First, Jones argues that the Wisconsin Worker's Compensation Act, Wis.Stat. § 102.01 *et seq.*, grants it a right to implement the program in order to reduce its disability payments to injured and ill employees. Second, Jones contends that the administrative law judge (the "ALJ") and the NLRB violated its right to due process by deciding the case on the basis of a no-strike clause in the collective bargaining agreement (the "CBA"), despite the fact that Local 538 (the "Union") did not prosecute its case on that theory. For the reasons discussed below, we deny Jones's petition for review and grant the NLRB's petition for enforcement of its order.

## I. BACKGROUND

At the time the dispute arose over the work hardening program, Jones and the Union were parties to a CBA effective from November 9, 1985, to October 1, 1988.[1] The CBA contained seniority and sick pay provisions. Article XI, the seniority clause, provided in material part:

11. In cases of proven disability, where an employee is not able to perform a job according to his seniority, the Company and the Union may deviate from

---

1. In 1966, Jones recognized Local P–1236 of the United Food and Commercial Workers Union as the bargaining agent of its production and maintenance employees. Local P–1236 merged with Local 538 during the pendency of this case. The parties do not dispute that Local 538 is the successor to Local P–1236. *See* NLRB's Brief at 4 n. 3.

the seniority provisions in order to place him on a job he can perform.

General Counsel's Exh. 2, at 34.

Article XVI set out the sick pay provisions. It read:

1. Regular full-time employees with twelve (12) months or more of continuous service with the Company, who are absent because of physical disability due to sickness or accident (except where such disability is covered by the Workmen's Compensation Law of Wisconsin), where such disability is supported by acceptable medical evidence, shall receive Sick Pay.

2. Subject to the other provision [sic] of this Article, Sick Pay shall be payable for each period the employee is prevented by such disability from performing any and every duty pertaining to the employee's occupation.

.    .    .    .    .

5. In cases of disability which would have been covered by this article but for the fact that they are covered by the Workmen's Compensation Law of the State of Wisconsin, the employee, if eligible under this article, will receive the difference between what he received as compensation under said law and the amount he would have received under this article but for the exclusion of the disability because of his being covered by the Workmen's Compensation Law.

*Id.* at 43, 45–46.

Further, the CBA contained a no-strike/no-lockout clause that read in part:

1. Since arbitration is provided for grievances, since the procedures of the National Labor Relations Board are available for claims of unfair labor practices, *and since negotiation on matters not covered by this Agreement is to be deferred until the expiration of this Agreement,* the Union will not call or sanction any strike, stoppage, slowdown or other interference with work during the term of this Agreement and the Company will not lock out any or all of its employees.

*Id.* at 42 (emphasis added).

Because of a high work-related accident rate, Jones and its worker's compensation insurer, EBI, began studying methods to reduce the number and severity of accidents and the cost of the company's disability payments. Among the options explored by the company was a so-called "work hardening" program offered by Opportunities, Inc. ("OI"), an organization specializing in boosting the confidence and strength of temporarily partially disabled workers and preparing them to return to their regular jobs. OI provides light duty jobs in a factory setting to temporarily partially disabled employees of participating companies. The companies pay a service fee to OI and also pay wages to their own employees. Under the program, a participating company's physician would examine a disabled employee and determine what, if any, work he could perform. An appropriate assignment would be made at OI, and the employee would work at the assigned position under the supervision and direction of OI. The employee would earn wages, which would be offset by a reduction in disability benefits. Jones proposed to pay its employees assigned to OI an hourly wage of $4.00—about one-third of the normal wages prescribed by the CBA. *Jones Dairy Farm and Local No. P–1236, United Food and Commercial Workers Union, AFL–CIO–CLC,* Case No. 30–CA–9395, at 3 (June 23, 1987) (hereafter the "ALJ's findings").[2] Jones asserts that even after state and federal taxes, the partially disabled employee would be no worse off than

**2.** Jones gives the following example of the program's operation:

Assume the employee's regular wage is $8.00 per hour and he regularly works 40 hours per week. His average weekly earnings are $320 ($8.00 × 40 hours). His worker's compensation indemnity for temporary total disability is $213.00 (⅔ × $320.00) [sic] If he works 20 hours per week on a limited duty job he is paid $80.00 ($4.00 × 20 hours) for that work.

His wage loss is thus reduced from $320.00 to $240.00, i.e., from 100% to 75% ($240.00 divided by $320.00). This results in a worker's compensation indemnity for partial disability of $159.75 (.75 × $213.00). He receives that indemnity, $159.75, plus the pay for the limited duty work, $80.00, for a total of $239.75, which is $26.75 more than the indemnity for temporary total disability.

Jones's Brief at 8–9.

if he had remained on temporary total disability status.[3] If the employee declines the limited duty work, however, his benefits are still reduced according to the formula, and he obviously does not receive any wages.

On June 23, 1986, Jones first notified the Union that it was considering the work hardening program as well as several plans directed at accident prevention and injury and health counseling. Representatives of Jones, EBI and the Union toured OI's facilities two days later, but when Jones again raised the proposal at a regular grievance meeting on July 14, the Union refused to give its consent. On September 29, 1986, Jones informed the Union that it intended to implement the OI program unilaterally on October 15; at the Union's request, Jones delayed action on the plan until it met with Union officials at a special meeting on October 17. At the meeting, the Union refused to consent to the work hardening program and specifically stated as its major concern the issue of bargaining unit employees working outside of Jones's premises.[4] On October 24, Jones advised the Union that it would unilaterally implement the program on November 3; the company sent letters to the same effect to all of its employees on October 31.[5] On November 11, the Union filed a grievance protesting Jones's unilateral implementation of the work hardening program, General Counsel's Exh. 7, and on November 17, the Union filed its charge with the NLRB.

The complaint issued by the General Counsel of the NLRB pursuant to the Union's charge accuses Jones of engaging in unfair labor practices in violation of sections 8(a)(1) and (5) and 8(d) of the National Labor Relations Act (the "Act," the "NLRA"), 29 U.S.C. §§ 158(a)(1) and (5), 158(d). Jones's App. at 32–37. The complaint explicitly alleges that the work hardening program modified the seniority and sick pay provisions without the Union's consent. The complaint mentions neither the no-strike clause nor the "management rights" clause contained in Article V of the CBA. General Counsel's Exh. 2, at 9.[6] Between November 1986 and April 1987 (when the parties presented their cases to the ALJ), Jones assigned seven of its employees to the OI work hardening program. Four agreed to participate; three refused and suffered reduced disability compensation. ALJ's findings at 5.

The ALJ concluded that the work hardening program was encompassed within "wages, hours, and other terms and conditions of employment" and was therefore a mandatory subject of bargaining under section 8(d) of the NLRA. The ALJ further determined that the Wisconsin Worker's Compensation Act was not preempted by the NLRA since the employer was not *required* to implement a light duty/rehabilitation program. Rather, according to the ALJ, the implementation of such a program was negotiable. The ALJ next addressed the Union's contention that the program impermissibly expanded the bargaining unit. He concluded that "farming out" bargaining unit employees, ALJ's findings at 12, was a permissible subject of bargaining that required the consent of both the Union and the employer. The ALJ then rejected Jones's contention that the no-

---

3. Jones does not explain precisely how much of the employee's wages from the limited duty work would be subject to federal and state taxes. Jones directs us to its Exhibit 13 in the administrative record, but that document expressly involves calculations based only on *gross* earnings. In light of our disposition of this case, however, the effect of taxes on the disability package is irrelevant.

4. The Union concedes that a temporarily partially disabled employee may be required to accept light duty work *at Jones's plant.* Subsection 11 of Article XI (the seniority provision of the CBA) nevertheless appears to require the consent of both the Union and Jones to place a recovering employee in a suitable position.

5. Shortly after implementing the program, Jones declared that it would not apply to employees whose sickness or disability was not work-related; Jones feared that subjecting such employees to the OI program would violate the sick pay provisions of the CBA. Jones's Brief at 5 n. 3. Jones does not explain, however, why application of the program to employees suffering from a work-related disability would not also violate the CBA's sick pay regimen.

6. We discuss the management rights clause below.

strike clause permitted it to take unilateral action on any subject (like the work hardening program) not covered by the CBA. The ALJ read the no-strike clause in a manner wholly contrary to Jones's interpretation, concluding that, in fact, the clause mandated that the status quo be preserved during the term of the CBA with regard to any subjects not specifically addressed in the CBA. Consequently, the ALJ ordered Jones to cease and desist from implementing the work hardening program without the Union's consent.

Jones fared no better with the NLRB, although the NLRB did modify the ALJ's findings in some respects. The NLRB agreed with the ALJ that the work hardening program was a mandatory bargaining subject under section 8(d) because worker's compensation benefits, although provided by state law, are nevertheless "emoluments of value which accrue to employees out of their employment relationship." *Jones Dairy Farm and Local No. P–1236, United Food and Commercial Workers Union, AFL–CIO–CLC*, 295 N.L.R.B. No. 20, at 7 (June 15, 1989) (citations omitted) (hereafter the "NLRB decision"). The Board rejected the ALJ's finding that the program was a permissive bargaining subject because it expanded the scope of the bargaining unit. However, the Board concluded that this aspect of the ALJ's determination was not necessary to the resolution of the case, since the Board also agreed with the ALJ that the no-strike clause prohibited Jones from unilaterally implementing the OI program.

## II. JONES'S CLAIMED RIGHT TO IMPLEMENT THE OI PROGRAM UNILATERALLY

■ Jones asserts, essentially, that its implementation of the work hardening pro-

gram was authorized by state law and was none of the NLRB's concern. In support of its position, Jones cites the Supreme Court's decisions in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), and *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Neither of these cases, however, removed the OI program from the purview of the NLRA and the regulatory jurisdiction of the Board.

Although neither the ALJ nor the NLRB devoted much attention to the matter, we consider it important to inquire initially whether the Wisconsin Worker's Compensation Act did in fact grant Jones a right to impose a light duty rehabilitation program as a means of reducing its disability indemnity. None of the parties has directed us to a provision of the Worker's Compensation Act that expressly vests an employer with such a right. The record, too, is ambiguous on this point.

Jones relies in large measure on a decision in its favor rendered by an ALJ in the Worker's Compensation Division of Wisconsin's Department of Industry, Labor and Human Relations (the "DILHR"). *Castenon v. Jones Dairy Farm*, Nos. 87 64614 & 88 11916 (Mar. 20, 1989), *reprinted in* Jones's App. at 38–46.[7] The *Castenon* decision, which explicitly declined to consider the applicability of federal labor law to the matter,[8] referred to Wis.Stat. section 102.35(3), but then stated that the present matter was *not* a section 102.35(3) dispute. That section provides:

(3) Any employer who without reasonable cause refuses to rehire an employe

---

7. Hereafter, we follow the pagination of Jones's Appendix when referring to the *Castenon* decision.

8. Indeed, the Labor and Industry Review Commission, to which Castenon and his fellow claimants appealed the state ALJ's decision, reversed the state ALJ's decision and declared the matter preempted in light of the NLRB's decision and order in the present case. Intervenor's Motion to Supplement the Record filed Oct. 10, 1989, at 1–7. Whether a matter that may be

governed by state law is preempted by an applicable federal law is, of course, a question of Congress's intent. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1909–10, 85 L.Ed.2d 206 (1985); *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978). For the reasons we give in this section, we agree with the NLRB that the NLRA and the Wisconsin Worker's Compensation Act can "peacefully coexist." NLRB decision at 6.

who is injured in the course of employment, where suitable employment is available within the employe's physical and mental limitations, upon order of the department and in addition to other benefits, has exclusive liability to pay to the employe the wages lost during the period of such refusal, not exceeding one year's wages. In determining the availability of suitable employment the continuance in business of the employer shall be considered *and any written rules promulgated by the employer with respect to seniority or the provisions of any collective bargaining agreement with respect to seniority shall govern.*

(Emphasis added.) Section 102.35(3) is clearly concerned with the rights of recuperating employees. It may be that the Wisconsin ALJ in *Castenon* extrapolated from this provision to a corresponding right in employers to insist that temporarily partially disabled employees work up to their physical and mental capacities.[9]

Another section of the Worker's Compensation Act that may apply is section 102.43(2). That section provides that the weekly compensation schedule for partial disability is "such proportion of the weekly indemnity rate for total disability as the actual loss of the injured employe bears to his average weekly wage at the time of his injury." Chris M. Faulhaber, Jr., Administrator of the Worker's Compensation Division of the DILHR, referred to section 102.43(2) in a letter to the Union's president and explained how benefits for partial disability are affected by earnings from part-time work. It could be inferred from Faulhaber's letter—although the letter did not say so expressly—that the DILHR would require a healing worker to accept a position within his capabilities if such a position were offered by his employer. But the letter emphasized that any "part-time or limited employment must be employment with the employer for whom the employe was working when injured" and "should be

within the parameters of the union contract in effect." General Counsel's Exh. 8.

Jones cites another source in support of its claimed right—the Worker's Compensation Handbook (1983 & Supp.1985) prepared by the Wisconsin Bar and reprinted in Jones's Exhibit 8. The Handbook does say that an employee is required to take light duty work (to the extent of his capacities) if it is offered by his own employer; however, the Handbook does not address whether an employee must take light duty work, assuming he is able, with a different employer or on different terms of employment. Further, the Handbook makes no mention of the potential effect of a CBA on the recuperating employee's obligation to return to light duty work. Finally, the Handbook asserts that its summary of employees' obligation to take light duty work is based on the "long-standing construction of the [Worker's Compensation] Statutes" by the DILHR and one unpublished opinion of the Wisconsin Circuit Court. Jones's App. at 36–37. The Handbook cites as its sole authority an unpublished Wisconsin Circuit Court case—*Gillette Well Drilling v. DILHR*, Case No. 143–142 (Dane Co. Cir.Ct. April 7, 1975). Under Wisconsin Civil Procedure Rule 809.23(3), unpublished cases have no precedential value.[10]

It may be under Wisconsin law that employers do have a right to insist that their partially disabled employees accept positions they are capable of performing, if the employer has such a position and makes it available. The parties have cited no published case, nor has our own research uncovered any, that establishes such a right. The evidence of DILHR policy contained in the record is inconclusive. Nevertheless, for the purposes of resolving this matter, we will assume that an employer is entitled under Wisconsin law to recall a recovering employee to an appropriate job at the employer's place of business.

Jones attempts to equate its asserted right with rights guaranteed to workers

---

9. The Wisconsin ALJ who rendered the *Castenon* decision testified before the NLRB that *Castenon* reflects the DILHR's interpretation of the Worker's Compensation Act. Tr. at 94–112.

10. Unpublished opinions may be cited only "to support a claim of res judicata, collateral estoppel or law of the case." Wis.Civ.P.R. 809.23(3).

under state laws prescribing, for example, minimum wages and maximum hours. Such laws predated the federal labor laws, and they form a floor for the negotiation of the substantive terms of a collective bargaining agreement. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21, 107 S.Ct. 2211, 2222, 96 L.Ed.2d 1 (1987) ("[P]re-emption should not be lightly inferred in [the area of state regulation establishing minimum terms of employment], since the establishment of labor standards falls within the traditional police power of the State."); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 757, 105 S.Ct. 2380, 2398, 85 L.Ed.2d 728 (1985) ("When a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act."). By comparing its asserted right, which it also labels an unqualified right,[11] to minimum labor standards laws, Jones would require us to choose between recognizing its asserted right or declaring the Wisconsin Worker's Compensation Act preempted. Such a choice is unnecessary. The Wisconsin statute has been drafted and interpreted to account for CBA provisions. Section 102.35(3) expressly defers to any applicable seniority provisions in a labor contract, and Faulhaber's letter to the Union's president emphasized that the employer's recall of an employee is subject to the terms of a binding CBA. In our view, therefore, the NLRB persuasively argues that even if Jones had a right under Wisconsin law to insist that its injured workers accept employment up to their capacities, Jones was not *required* by state law to exercise that right. The right—if it indeed existed—was negotiable.

■ The Board accepted the ALJ's conclusion that the OI program was a mandatory subject of bargaining, since it clearly fell within the scope of "wages, hours, and other terms and conditions of employ-

ment." 29 U.S.C. § 158(d). The Board's findings of fact must be upheld if they are supported by substantial evidence on the record as a whole, 29 U.S.C. § 160(e); *David R. Webb Co. v. NLRB*, 888 F.2d 501, 503 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990). Further, the Board's legal conclusions should be accepted and enforced unless they are irrational or inconsistent with the act. *NLRB v. Financial Institution Employees*, 475 U.S. 192, 202, 106 S.Ct. 1007, 1012–13, 89 L.Ed.2d 151 (1986); *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); *David R. Webb Co.*, 888 F.2d at 503, 505; *Maas & Feduska v. NLRB*, 632 F.2d 714 (9th Cir.1979). In particular, we give substantial deference to the Board's determinations about mandatory and permissive subjects of bargaining. *Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. at 1849; *Jack Thompson Oldsmobile, Inc. v. NLRB*, 684 F.2d 458, 461–62 (7th Cir.1982); *Maas & Feduska*, 632 F.2d at 718–19.

The NLRB noted that the OI program affected temporarily disabled employees' wages, hours, types of work and workloads. Further, the program would have reduced employees' sick pay and disability benefits, and these welfare benefits are a mandatory subject of collective bargaining. *See Metropolitan Life*, 471 U.S. at 751–52, 105 S.Ct. at 2395–96 (citing *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 159 & n. 1, 92 S.Ct. 383, 387 & n. 1, 30 L.Ed.2d 341 (1971)). Even if sick pay and disability benefits were not *per se* mandatory bargaining items, they became so by their inclusion in the CBA. Article XVI(2) clearly stated that sick pay "shall be payable for *each* period that the employee is prevented by such disability from performing *any and every duty* pertaining to the employee's occupation." (Emphasis added.) Subsection 5 of the same article required Jones to make up the

---

11. Jones declares in its brief: "Even if the collective bargaining agreement *in haec verba* were to preclude Jones from providing limited duty work, a unilateral modification of the agreement to elimination [sic] that prohibition would not constitute a violation of section 8(d)."

Jones's Brief at 19. Since we have some difficulty accepting Jones's argument that such a right exists at all, we have considerably more reservations about deeming the "right" absolute and independent of Jones's collective bargaining obligations.

difference, if any, between an employee's state-mandated worker's compensation benefits and "the amount [the employee] would have received under this article but for the exclusion of the disability because of his being covered by the Workmen's Compensation Law." Jones's obligations under the CBA with regard to sick pay and disability benefits were explicit. Jones could not attempt to modify unilaterally those provisions during the term of the CBA without obtaining the Union's consent or bargaining to impasse. 29 U.S.C. § 158(d). The NLRB's conclusion that the OI program was a mandatory bargaining topic is, therefore, objectively reasonable and wholly supported. We accept that determination as conclusive in these circumstances.

The Board did not reach the question, however, whether Jones had bargained with the Union over the OI program in good faith to impasse. Jones does not argue in its petition to us that impasse was reached, or even sought. In the alternative to its claim of an unqualified right to implement the OI program unilaterally, Jones maintained before the ALJ and the Board that the no-strike clause permitted it to take action unilaterally with respect to any item not covered by the CBA. Both the ALJ and the Board took the opposite view of the no-strike clause's import, and the Board resolved the matter on the basis of its reading of that clause.[12]

We owe the Board no special deference in matters of contractual interpretation. *Irvin H. Whitehouse & Sons Co. v. NLRB,* 659 F.2d 830, 833 (7th Cir.1981); *Local Union 1395, Int'l Bhd. of Electric Workers, AFL–CIO v. NLRB,* 797 F.2d 1027, 1030–31 (D.C.Cir.1986). But we are, of course, mindful of the Board's considerable experience in interpreting collective bargaining agreements. According to the Board, the no-strike clause was intended by the parties to preserve the status quo dur-

ing the agreement's term on mandatory bargaining matters not addressed by the CBA, "just as Section 8(d) [of the NLRA] preserves the status quo as to subjects covered by the agreement." NLRB decision at 8. Thus, any alteration of the terms of employment during the life of the CBA required mutual assent, and it is undisputed that the Union withheld its consent here. The no-strike clause clearly evinced a desire by the parties to *defer* negotiation on mandatory items, not, as Jones argues, to *waive* it. Therefore, we agree with the NLRB and the ALJ that Jones was not free to implement the OI program during the term of the CBA without the Union's consent; nor could Jones insist that the Union bargain to impasse on that subject. Jones's unilateral implementation of the OI program therefore violated sections 8(a)(1) and (5) of the NLRA. The Board properly ordered Jones to cease and desist from unilaterally implementing the program and to make restitution to the affected employees.

## III. JONES'S DUE PROCESS CLAIM

Having failed to convince the ALJ or the NLRB of its "right" to implement the OI program, Jones now claims that its due process rights were violated because the ALJ and the NLRB resolved the matter on the basis of the no-strike clause. Since the Union's charge did not specifically allude to the no-strike clause, Jones complains that it did not receive fair notice of that theory and that it was consequently deprived of an opportunity to prepare an adequate defense.

It is somewhat incongruous that Jones should charge the NLRB with a due process violation, since it was *Jones* that drew the ALJ's and the Board's attention to the no-strike clause in the first place. This clause was, indeed, a principal component of Jones's defense in the administrative

---

12. As we noted above, the ALJ rested his decision on the determination that Jones's "farming out" of bargaining unit employees to OI was a *permissive* subject of bargaining that could not be implemented without the Union's consent. Although the Board disagreed with this aspect of the ALJ's findings, the issue did not affect the outcome of the case. Since we resolve the matter on other grounds, we do not reach the Union's contention that the OI program illegally enlarged the scope of the bargaining unit.

proceedings to the Union's unfair labor practice charge. Jones is now dissatisfied with the intepretation of the clause rendered by the ALJ and accepted by the NLRB (and by this court). That the ALJ and Board disagreed with Jones over the meaning of the no-strike clause, however, is no basis for a claim that Jones was denied due process.

Evidently, Jones hopes for a remand so that it can introduce some unspecified evidence from the bargaining history in support of its reading of the no-strike clause. But Jones has already been afforded two opportunities to marshall its evidence. We will not remand the case merely because Jones "assures" this court that such evidence exists, Jones's Brief at 13, without making any effort to particularize the substance of its would-be proffer.

Finally, Jones argues that, had it been apprised that the ALJ and NLRB would base their decisions on the no-strike clause, it would have defended its position by referring to a "management rights" clause in the CBA. Since Jones itself brought up the no-strike clause, it could have (and should have) drawn the NLRB's attention to the management rights clause as support for its reading of the no-strike clause. Jones's inexcusable failure to avail itself before the Board of all of its possible defenses, particularly after the adverse decision of the ALJ, deprives it of the right to have those arguments decided here.[13] Jones's claim that it was denied due process of law rings hollow.

## IV. CONCLUSION

The NLRB concluded that "[n]othing in the management-rights, sick leave, no-strike/no-lockout provisions or any other section of the collective bargaining agreement permitted the Respondent to alter the status quo in the manner that it has in this case." NLRB decision at 9–10. Because we agree with the Board's reading of the

CBA, Jones's petition for review is DENIED, and the NLRB's order is ENFORCED.

---

**13.** In any event, it appears that the NLRB, which had the entire CBA before it as an exhibit, in fact considered whether the CBA gave Jones residual authority to take unilateral ac-

tion in the furtherance of its business with respect to matters not covered by the CBA. NLRB decision at 9 n. 13. The Board found no such broad grant of authority in the CBA in this case.